In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-2844

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

JERRY JARRETT,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 03 CR 87—**William C. Lee**, *Judge.*

ARGUED FEBRUARY 21, 2006—DECIDED MAY 9, 2006

Before MANION, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Jerry Jarrett is an aggressive and successful criminal defense attorney from northern Indiana. Jarrett, however, has not always limited his services to representing accused clients. On at least two occasions, according to a jury that found him guilty beyond a reasonable doubt, he helped drug dealers launder money produced by their illegal enterprises. And for those activities he came to the attention of federal prosecutors, which eventually led to the jury that heard his case.

After he was tried and convicted for money laundering and illegally structuring financial transactions, Jarrett moved to have his indictment tossed out, claiming he was the victim of a vindictive prosecution. Jarrett argued

that the government only came after him because he succeeded in getting state murder charges dismissed against a client who was the target of a highly publicized, joint federal-state investigation. In a lengthy and detailed opinion, the district court (the venerable Judge William C. Lee presiding) found that Jarrett was vindictively prosecuted. Upon that finding, the court vacated the jury verdict and dismissed the charges. The government, hoping to revive the jury's verdict, appeals.

Jarrett, it is alleged, began cleaning up dirty money in April 1999, when a drug dealer named Carlos Ripoll brought him $67,000 in cash. Jarrett deposited the money in a series of small transactions (to evade currency transaction reports) into the bank account of a dormant small business he controlled.[1] Jarrett then prepared a backdated stock purchase agreement, representing that Ripoll had "invested" $15,000 in Jarrett's company, and issued a series of checks to Ripoll totaling $54,452 for "return on investment." As compensation for his services, Jarrett pocketed $12,000.

Beginning in September 1999, Jarrett executed a similar series of sham transactions with a cocaine dealer named Gregory Goode, laundering $25,000 in drug money and keeping a $7,000 profit.

---

[1] Jarrett incorporated this business, "Left-Filled, Inc.," with his son in 1997, a time when Jarrett was disbarred for what the Indiana Supreme Court called "an alarming pattern of dereliction of duty, abandonment of clients' interests, often resulting in irreparable damage, and a blatant disregard of professional responsibilities." *In re Jarrett*, 657 N.E.2d 106, 109 (Ind. 1995). Left-Filled was supposed to market products for left-handed people. However, it apparently sold only a few items and never turned a profit. Jarrett regained his license to practice law in September of 1999.

Three months later, Ripoll was arrested and quickly began talking to the government. Among other things, he described his financial dealings with Jarrett, telling investigators that Jarrett was aware that he was handling drug money. Ripoll also described his drug dealings with Goode.

A federal grand jury subpoenaed Jarrett to testify in December 1999. Jarrett was designated as a fact witness, not a target, and fully cooperated. He produced records of his financial dealings with Ripoll and Goode but denied any knowledge that the money he received had come from drugs. (He said Ripoll and Goode told him that the money came from gambling winnings, selling cars, and rehabbing houses.)

In late 2000, after Goode was arrested, he gave a sworn proffer to the government in anticipation of plea negotiations. Goode, who at the time was represented by an attorney Jarrett told him to hire, said Jarrett cleaned up a small amount of his money. However, he was equivocal about whether Jarrett knew the money came from drug dealing. In the proffer, Goode lied about his own drug-dealing activities and, according to a statement given a few years later, about the amount of money he gave Jarrett. The plea negotiations fell apart, and nothing came of the proffer. After he was tried and convicted of conspiracy to distribute cocaine and money laundering, Goode fired the lawyer who was recommended by Jarrett.

Although it apparently had enough evidence to indict him, the government let its investigation of Jarrett lay dormant throughout 2001 and 2002. Prosecutors said they were unwilling to go to trial with only the testimony of one convicted criminal—Ripoll—to establish Jarrett's knowledge that the cash he deposited came from drug proceeds.

In January 2003, the U.S. Attorney's office (USAO) for the Northern District of Indiana again approached Goode, this time through the new attorney who was representing him on appeal. The attorney had been appointed by the court and thus, unlike Goode's trial counsel, had no ties to Jarrett. This time the two sides struck a deal, and 2 months later Goode changed his story from his 2000 proffer and told a grand jury that Jarrett did indeed know that the money they exchanged came from selling drugs. The grand jury knew Goode was a convicted felon (he testified in his prison jumpsuit) and thus could weigh the consideration that his testimony might not be completely credible. However, the government did not tell the grand jury that Goode was testifying as part of a deal that would reduce his 15-1/2-year sentence. Ripoll's earlier statements about Jarrett were presented in hearsay form. With Goode's testimony in hand, the government notified Jarrett in May 2003 that he was the target of a grand jury investigation for money laundering.

Meanwhile, Jarrett was busy with the headline-grabbing case of Dr. Jong Hi Bek. In July 2002, authorities capped a long-running, joint federal-state investigation by raiding the Gary clinic where Bek was prescribing painkillers and other controlled substances to drug addicts. Lake County (Indiana) prosecutors charged Bek with felony murder for the deaths of two of his clients. Federal prosecutors also charged him with illegally distributing controlled substances; they later dismissed this complaint so the state case could proceed, but about the same time filed a federal civil forfeiture action.

As Bek's attorney, Jarrett moved in September 2002 to compel disclosure of the state's expert witnesses, who would be needed to establish that Bek's prescriptions actually caused the two patients' deaths. After some foot-dragging, the state admitted in March 2003 that it lacked conclusive toxicology evidence against Bek, and a month later it

voluntarily dismissed the murder charges. This was an embarrassment for the Lake County prosecutors, given the public attention the Bek investigation had generated.

Four months later, federal prosecutors reindicted Bek for illegal drug distribution and other charges. Since Jarrett, who was still serving as Bek's attorney, was the target of a separate criminal investigation into the money-laundering scheme, the government urged the district judge in the Bek case to disqualify him, arguing that an attorney facing his own legal problems with federal prosecutors might have a conflict of interest that would keep him from rendering effective assistance to his client. The court determined that Bek understood the potential problem but still wanted to keep Jarrett as his attorney.[2]

In October 2003, IRS investigators recommended charges against Jarrett. In December 2003, 4 years after Jarrett first testified about his activities with Ripoll and Goode, a grand jury indicted him on six counts of money laundering and illegal structuring.

With this factual background established, Jarrett's argument can be succinctly summarized: He had a legal right and duty to provide a vigorous defense for his client, Dr. Bek. Because he had succeeded in getting the state's felony-murder charges dismissed, he embarrassed not only Lake County officials but also their federal partners in the Bek investigation—namely, the U.S. Attorney's office. The feds now had to take over the Bek prosecution, and—out of retaliation, or fear of Jarrett's legal acumen, or both—they wanted Jarrett sidelined by any means necessary. So they revived a case that had gone cold—the 3-year-old money laundering probe—and indicted him for the sole purpose of getting him off the Bek case.

---

[2] Jarrett later withdrew from representing Bek for financial reasons. Bek was eventually convicted on all federal counts.

On a claim of vindictive prosecution, we review the district court's legal conclusions *de novo* and its findings of fact for clear error. *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003).

The Constitution prohibits the government from undertaking a prosecution based solely on a vindictive motive. "[F]or an agent of the [United States] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights" is "a due process violation of the most basic sort . . . ." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). A claim of vindictive prosecution "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).

At the same time, the Supreme Court's decisions have recognized that government prosecutors have a wide discretion over whether, how, and when to bring a case. "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Id.* at 464 (quoting *Bordenkircher*, 434 U.S. at 364). Because a claim of vindictive prosecution "asks a court to exercise judicial power over a 'special province' of the Executive," courts must begin from a presumption that the government has properly exercised its constitutional responsibilities to enforce the nation's laws. *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). This "presumption of regularity" in prosecutorial decision making can only be overcome by "clear evidence to the contrary." *Id.* The standard of proof "is a demanding one." *Id.* at 463.

In order to succeed on a claim of prosecutorial vindictiveness, a defendant "must affirmatively show through

objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *Falcon*, 347 F.3d at 1004; *United States v. Bullis*, 77 F.3d 1553, 1559 (7th Cir. 1996); *see also United States v. Johnson*, 221 F.3d 83, 94 (2nd Cir. 2000) (A finding of "actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the prosecutor . . . ."). A defendant may do this by showing that the decision to pursue an indictment was not based on the "usual determinative factors" a responsible prosecutor would consider before bringing charges. *United States v. Spears*, 159 F.3d 1081, 1086 (7th Cir. 1998). Only after a defendant comes forward with objective evidence of actual vindictiveness does the burden shift to the government to show that the motivation behind the charges was proper. *Bullis*, 77 F.3d at 1559. A court must be persuaded that the defendant would not have been prosecuted but for the government's animus or desire to penalize him. *United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996); *United States v. Goodwin*, 457 U.S. 368, 380 n.12 (1982).

Although there are limited circumstances in which a defendant is entitled to a burden-shifting presumption of vindictiveness, cases where courts have found such circumstances have arisen exclusively in the post-trial context. *Falcon*, 347 F.3d at 1005 (citing *Goodwin*, 457 U.S. at 382); *also see Blackledge v. Perry*, 417 U.S. 21 (1974) (finding a presumption of vindictiveness where the prosecutor pursued enhanced charges after the defendant successfully challenged his conviction and was awarded a new trial).

When a defendant is challenging his indictment, the presumption of regularity in favor of the government's conduct, combined with the requirement of clear evidence to the contrary and the "rigorous standard" by which such evidence must be evaluated, *Armstrong*, 517 U.S. at 468, means that a claim of vindictive prosecution is extremely

difficult to prove. Acknowledging that it could find no reported appellate decisions in which such a claim was upheld, the district court looked for guidance to *United States v. Wilson*, 262 F.3d 305 (4th Cir. 2001). Although the Fourth Circuit in *Wilson* reversed a district court's finding of vindictive prosecution, it suggested that there may be times when a defendant who has been "unable to prove an improper motive with direct evidence . . . may still present evidence of circumstances from which an improper vindictive motive may be presumed." *Id.* at 314. *Wilson* did not offer a framework for how a court might decide when a presumption of vindictiveness in the government's pretrial behavior is called for, saying only that "the circumstances . . . must be sufficiently suggestive of vindictive prosecution that when similar circumstances are presented in other factual contexts, the same conclusion would be suggested." *Id.* at 317-18 (citing *Goodwin*, 457 U.S. at 381). Applying the nebulous guidance of *Wilson* to what it called the "compelling" circumstances of Jarrett's case, the district court concluded that a presumption of vindictive prosecution was appropriate. Moreover, it found that the presumption was "totally unrebutted by the government."

No other appellate court appears to have joined the Fourth Circuit in suggesting how a presumption of government vindictiveness may be created based on events before trial. In *Goodwin*, the Supreme Court explained why "[t]here is good reason to be cautious before adopting" such a presumption:

> In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may have come to realize that information possessed by the [government] has a broader significance. At this stage of the proceedings, the prosecutor's assessment of

the proper extent of prosecution may not have crystal-
lized.

    . . . .

. . . A prosecutor should remain free before trial to
exercise the broad discretion entrusted to him to
determine the extent of the societal interest in prosecu-
tion.

*Goodwin*, 457 U.S. at 381-82.

Accordingly, our own precedents have not recognized
any circumstances in which a presumption of vindictiveness
may be applied to events that took place before trial. *See
Spears*, 159 F.3d at 1086 (noting that the Supreme Court in
*Goodwin* had "refused to extend" such a presumption and
that the only way for a defendant to prove vindictiveness is
through objective evidence); *see also* Wayne R. LaFave *et
al.*, *Criminal Procedure* (3d ed. 2000) (noting that in light of
*Goodwin*, it is "unlikely" that a presumption of vindictive-
ness "has any application whatsoever in a pretrial setting").
Against this landscape we conclude that the district court
committed legal error when it found such a presumption to
be warranted in the circumstances of Jarrett's indictment.

Without benefit of a presumption against the government,
Jarrett's claim can only succeed if he has shown clear and
objective evidence of genuine prosecutorial vindictiveness
which the government has not successfully rebutted. Based
on our own examination of the record and the factors on
which the district court relied, we conclude that the evi-
dence is not legally sufficient to support a finding of
vindictiveness.

First, it should be noted that at no point has Jarrett
produced any public or private statement by a pros-
ecutor manifesting animus toward him; any document
that might establish bad motives on the part of the govern-
ment; or any similar "smoking gun." And so he builds his

case on examples of suspicious timing, speculation about the government's motives, and allegations that the U.S. Attorney's office failed to follow its internal procedures in pursuing his indictment. Similarly, the district court based its finding on the "cumulative weight" of the facts it considered, acknowledging that "any one of these facts might appear suspicious but not indicative of vindictive prosecution." But that reasoning—the whole amounts to more than the sum of its parts—cannot take the place of clear and objective evidence, especially when the standard for vindictive prosecution is so rigorous.

The core premise around which Jarrett builds his claim is that his indictment resulted directly from his success in getting Dr. Bek's murder charges dismissed. But with no direct evidence to point to, Jarrett must resort to speculation about the USAO's motives. He reasons that because federal and state authorities worked together on the Bek case, the USAO had a "stake in the outcome of Bek's [state] trial." When the state case against Bek collapsed, Jarrett insists we must believe, the "taint of the unsustainable murder charges was felt in both agencies." On this basis, and looking for legal support from *Falcon*, *see* 347 F.3d at 1004, he believes that the USAO "had a stake in the outcome of [his] case and a strong motive for seeking self-vindication."

Jarrett does not convincingly explain how his indictment in a completely different case "vindicated" the government's role in the Bek prosecution (he continued representing Bek until the two parted ways after a dispute over attorney's fees) or erased whatever "taint" the USAO supposedly felt. What Jarrett really seems to be saying is that the feds orchestrated his indictment as payback, or because they feared him as an adversary once it became their responsibil-

ity to salvage something from the Bek investigation.[3] The district court appeared to credit both theories, at one point expressing its view that the government had indicted Jarrett "simply to remove a foe from a highly-publicized case in which the prosecutors have suffered criticism," and observing at another point that although the government could have indicted Jarrett for money laundering back in 1999, it "did not target Jarrett until he forced the Bek case to federal court, where he stood as a formidable opponent."

Recall that the Bek case collapsed because the state's toxicologist could not establish that Bek's prescriptions actually caused two deaths. Jarrett's primary role, pretrial, was to lodge motions (and argue Bek's innocence to the news media). But with all due respect to Jarrett's professional acumen, moving to compel disclosure of the state's expert evidence did not make him Perry Mason outwitting a hapless Hamilton Burger. Indeed, in a felony murder case against a doctor accused of illegally dispensing narcotics, it would have been unusual, if not irresponsible, for the defense *not* to probe the strength of the toxicology evidence the state would present at trial.

To be sure, the Lake County prosecutors must have been embarrassed when they had to dismiss their case. But it does not follow that this embarrassment must also be imputed to the USAO. Jarrett offers no evidence, for example, that the federal government itself was criticized in any media accounts.[4] And so we cannot simply presume

---

[3] At oral argument, Jarrett said he was not claiming that he was the only attorney who could successfully have defended Bek, or even that he would have won against the subsequent federal prosecution, only that he believed the government knew he would have put up "fierce opposition."

[4] In its story of April 22, 2003, headlined "State drops two murder
(continued...)

bad motives by the government. The Supreme Court has admonished that courts should not "assume that a prosecutor's probable response to [pretrial] motions is to seek to penalize and to deter." *Goodwin*, 457 U.S. at 381. Moreover, the likelihood of vindictive prosecution is reduced when successive prosecutions are brought by different sovereigns. *United States v. Dickerson*, 975 F.2d 1245, 1251 (7th Cir. 1992); *United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981). While it described him as an "aggressive and highly successful defense attorney," the district court did not find that Jarrett had some unique ability to defend Bek against the federal prosecution. And the fact that the government gained an opportunity to reopen its investigation of Jarrett during the time he was representing Bek cannot, by itself, serve as evidence of a vindictive motive. "The timing of [a] federal prosecution, alone, cannot change [a] legitimate exercise of normal prosecutorial discretion into a vindictive prosecution." *Dickerson*, 975 F.2d at 1252.

Indeed, a closer look at the actual sequence of events does not support the theory that the failure of the Bek murder case caused the government to revive its money laundering investigation against Jarrett. The USAO approached Goode with its deal to testify against Jarrett in January 2003. A Rule 35 motion (to reduce sentence) was filed in February, and Goode appeared before the grand jury on March 6. It was not until more than 2 weeks later—March 21—that the state's expert acknowledged he did not have the critical evidence against Bek and a month after that—April 23—that the state murder charges were dismissed. The district court's opinion implied that trouble may have been

---

[4] (...continued)
charges against Bek," the *Gary Post-Tribune* makes only passing reference to the U.S. Attorney's office as a participant in the Bek investigation along with the Lake County prosecutor and Indiana State Police.

brewing in the Bek case around the time the USAO sought out Goode's cooperation, noting that the state missed two deadlines for producing its toxicology evidence. But if the government began moving against Jarrett in January 2003 because it was concerned that the state's Bek case might unravel several months down the road, Jarrett has produced no evidence whatsoever, only his own speculation, to support that crucial point. And speculation is not a sufficient basis for determining that Jarrett would not have been prosecuted but for the government's animus or desire to penalize him. *See Monsoor*, 77 F.3d at 1034; *Goodwin*, 457 U.S. at 380 n.12.

Since the central premise of Jarrett's argument does not withstand scrutiny, one would have to squint hard at all the circumstantial evidence surrounding it, and draw a number of critical inferences in Jarrett's favor, to conclude that he would not have been prosecuted but for the vindictive motivation of the government. The applicable legal standard does not, however, permit giving Jarrett such large benefits of the doubt. While the district court was troubled by what it regarded as various suspicious circumstances surrounding Jarrett's indictment, suspicion is not proof, and we do not find in these events the clear and objective evidence needed to establish vindictive prosecution.

Perhaps the most tangible allegation Jarrett lodges against the USAO—and the issue that seemed most troubling to the district court—was its failure to disclose certain information to the grand jury that indicted him. The government did not inform the grand jury that Goode was testifying in exchange for a sentence reduction; did not call Jarrett so he could tell his side; did not correct Goode's perjurious statement that he never dealt in crack; and did not disclose certain exculpatory evidence, particularly Jarrett's 1999 testimony in which he denied knowledge that the cash he received from Ripoll and Goode came from drug

sales. The grand jury also did not know that Goode told a somewhat different story about Jarrett in his December 2000 proffer. Jarrett maintains that all this violated the spirit, if not the letter, of various provisions in the handbook for U.S. Attorneys. While the district court acknowledged that none of the government's behavior was sufficient grounds to dismiss an otherwise valid indictment, it accepted Jarrett's argument that the government's supposed lack of fidelity to its own policies was objective evidence that it did not base its pursuit of Jarrett on the "usual determinative factors" in a prosecution. *See Spears*, 159 F.3d at 1086.

We believe the district court misconstrued the meaning of "usual determinative factors." This term in its ordinary meaning refers to the various considerations a responsible prosecutor in the ordinary course of things would weigh in deciding whether or not to bring a particular charge. *See, e.g.*, *United States v. DeMichael*, 692 F.2d 1059, 1062 (7th Cir. 1982) (noting that "[t]here is no vindictiveness as long as the prosecutor's decision is based upon the *normal factors ordinarily considered in determining what course to pursue*") (emphasis added). For example, we have explained that "[t]he United States Attorney in one district may properly take into consideration the results of prosecution in another district in determining whether to proceed with prosecution for the offenses committed within his bailiwick." *Id.*

Failure to follow internal operating policy in prosecuting is not, by itself, evidence of vindictive prosecution. *United States v. Benson*, 941 F.2d 598, 612 (7th Cir. 1991); *United States v. Mitchell*, 778 F.2d 1271, 1276 (7th Cir. 1985). And we do not see how "usual determinative factors" could encompass the conduct of government attorneys before grand juries. Case law, not internal handbooks, provides the guidance for whether a prosecutor has crossed the line in pursuing an indictment. *See United States v.*

*Gillespie*, 974 F.2d 796, 800 (7th Cir. 1992) (explaining that *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), and *United States v. Williams*, 504 U.S. 36 (1992), "articulate clear limits" on the authority of federal courts "to exercise our supervisory powers as a means of imposing preferred policies" in the grand jury context "in the absence of any constitutional or congressional imperative"); *see also Williams*, 504 U.S. at 36 (a court may not dismiss an otherwise valid indictment because the government failed to disclose substantial exculpatory evidence to the grand jury); *id.* at 52 (while the government may call a target to testify before the grand jury considering his indictment, it is under no obligation to do so).

Jarrett assumes that a nonvindictive prosecutor would have afforded him a sort of mini-trial in front of the grand jury. But the Supreme Court explained a half-century ago that the Fifth Amendment's grand jury guarantee does not give defendants the right to a "preliminary trial to determine the competency and adequacy of the evidence before the grand jury." *Costello v. United States*, 350 U.S. 359, 363 (1956). Since the indictment that issued was legally valid, we cannot consider what was not presented to the grand jury as clear and objective evidence of vindictiveness by the prosecution.

While the district court found that the government had the evidence it needed to indict Jarrett back in 1999, the government's assessment that it needed Goode's testimony to bolster its case and improve its chances of securing a conviction is entitled to deference. There is no sound reason to second-guess the government's position that Goode's agreement to cooperate in early 2003 was the "turning point" of its investigation because it gave prosecutors a second, corroborating witness about Jarrett's knowledge that he was handling drug money. Waiting to build a stronger case before pursuing an indictment is evidence of responsible, rather than vindictive, government behavior.

Finally, although the government had Goode's 2000 proffer, it did not have Goode himself, for he did not agree to testify until later. His proffer was hearsay, *see United States v. Maldonado*, 38 F.3d 936, 942 (7th Cir. 1994), and would have been inadmissible under the Confrontation Clause if the case went to trial without his live testimony in 2000 or 2001. *See* cases cited in *Crawford v. Washington*, 541 U.S. 36 (2004).

The district court speculated that Goode had a strong motive to fabricate his testimony about Jarrett and that Jarrett's cross-examination exposed Goode as someone who lied in the past and would "say whatever most benefits him at the moment." But a trial judge does not sit as a 13th juror to evaluate the credibility of a witness, *United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003), and the jury apparently found Goode's testimony credible enough (or that the evidence was sufficient even with less than persuasive testimony from Goode) to support Jarrett's conviction. Be that as it may, for purposes of establishing vindictive prosecution, Jarrett has presented no objective evidence that the government did not believe that Goode's testimony was essential to gaining a conviction.

Finally, Jarrett sees evidence of vindictiveness in the government's effort to have him removed as Bek's counsel based on a potential conflict of interest. At the hearing on that question, the government argued vigorously that Jarrett should be removed because his indictment was imminent. While this was a clear effort to get Jarrett off the Bek case, we cannot say it was a misplaced or unusual one, and we cannot simply infer that the government's motive was animus, retribution, or fear of Jarrett's legal abilities. After all, it would have been irresponsible of the government not to notify the judge of a potential problem that could affect Bek's right to conflict-free counsel. *See United States v. Levy*, 25 F.3d 146, 152 (2nd Cir. 1994). The government also filed notices in the two other cases where

Jarrett was representing federal defendants. Although the assistant U.S. attorney who made the argument at the Bek hearing had previously worked in the Lake County prosecutor's office, the record shows she had not worked on the Bek matter there and was not working on the Jarrett matter for the USAO. The fact that there was some overlap between the personnel in the state prosecutor's office and the USAO does not support a finding of prosecutorial vindictiveness. *United States v. Algee*, 309 F.3d 1011, 1015 (7th Cir. 2002). And, it should also be noted, the AUSA did not speak up at the conflict hearing until the special standby counsel, who was appointed to offer advice to Bek, voiced his concerns over whether Bek was making a fully informed waiver of conflict-free representation from Jarrett.

For all these reasons, the judgment of the district court dismissing the indictment is REVERSED, and the jury's verdict is ORDERED REINSTATED. Mr. Jarrett will have a full opportunity to challenge any aspect of his trial, or proceedings that occur after remand, by appropriate motion or appeal. The case is thus REMANDED for further proceedings.

A true Copy:

       Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*