In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-4601 & 05-4756

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL SEGAL and NEAR NORTH
INSURANCE BROKERAGE, INC.,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CR 112—**Ruben Castillo**, *Judge.*

———————

ARGUED APRIL 12, 2007—DECIDED AUGUST 2, 2007

———————

Before RIPPLE, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* Michael Segal and Near North
Insurance Brokerage (NNIB) were charged in 27 counts
of a 28-count fourth superseding indictment: Segal with
racketeering, mail and wire fraud, false statements,
embezzlement, and conspiring to impede the Internal
Revenue Service; NNIB with mail and wire fraud, false
statements, and embezzlement. A jury returned guilty
verdicts on all counts (except one which the government
dismissed), but the district court (Judge Ruben Castillo)
granted a judgment of acquittal on 7, leaving a grand total
of 19 standing at the end of the day. NNIB was ordered to
pay a $1.4 million fine and pay restitution totaling

$841,517.96. Segal was sentenced to 121 months imprisonment, ordered to pay $841,527.96 in restitution, and forfeit $30 million and his interest in the racketeering enterprise.

Segal was a licensed attorney, a CPA, and an insurance broker who began working for NNIB in 1964 when it was owned by George Dunne, a prominent politician and president, for 21 years, of the Cook County Board. By the early 1990s Segal was the owner and sole shareholder of the company. He then formed NNNB, a holding company, to be the corporate parent of NNIB and many of his other financial interests. During the 1990s NNIB was earning close to $50 million annually.

During the period covered by the indictment—1990-2002—Illinois law, as set out in 50 Ill. Admin. Code § 3113.40(a), required insurance brokers to maintain a premium fund trust account (PFTA) into which all premiums were to be deposited and held in a fiduciary capacity until the carriers demanded the premium payments. The time between a broker's receipt of premium payments and the carrier's demand—called the "float"—varied with the carrier. Commissions, interest, credit, and other nonpremium money could be withdrawn, but brokers were required to maintain PFTAs in trust with sufficient funds to pay premiums. The accounts could not be used as operating accounts. Failure to properly maintain a PFTA was grounds for suspension or revocation of a broker's license. Conversion of more than $150 was a felony.

NNIB maintained both a PFTA and an operating account, but everything was deposited in the PFTA, and the operating account was maintained with a zero balance. Funds were transferred to the operating account from the PFTA to pay expenses, but after those payments were made everything was transferred back to the PFTA. The

chief financial officer of NNIB from 1990 to 1998, Norman Pater, considered this practice to be a violation of the regulations, as did his successor, Donald Kendeigh, and, in turn, his successor, Thomas McNichols.

Nevertheless, Segal expanded his business, purchasing brokerages in New York, California, Texas, and Florida. In addition, he purchased several other companies, ranging from a fire suppression device manufacturer to a software maker. The acquisition of these entities was funded by NNIB's PFTA. Most of the companies were losing money, so there were regular wire transfers from the PFTA to keep them solvent. By the end of 1989 the PFTA was over $7 million out of trust. At the end of 1995 it was $10 million short, and by August 2001 the deficit had grown to $30 million. Evidence shows that Segal knew he was converting PFTA money to fund expansion and for other unauthorized purposes. Auditors regularly told him so. Segal contended it was no big deal. He told McNichols that every insurance company operates the way he did. In the face of this sort of operation, the auditing firm McGladrey & Pullen resigned, as had an earlier firm, Deloitte & Touche.

The cash shortfall in the PFTA was so bad in January 2001 that Segal had the head of the NNIB branch in Los Angeles wire $3 million to cover payments which were due to carriers. Reluctantly he wired the money on January 16; on the 22nd, $2.4 million was wired back to Los Angeles.

In April 2001, McNichols drafted a letter to Segal outlining an NNIB Management Operations Plan. Its purpose was to bring NNIB into compliance with the law. The plan proposed putting control of NNIB into an executive committee that would report to Segal but be free to act without his approval. The plan called for selling off money-losing affiliates, segregating PFTA from operating

funds, and obtaining an outside audit. The letter noted that the PFTA was $17 million in deficit but that for years Segal had shown no interest in balancing it, that outside auditors had quit because of the deficit, that Segal's wife said Segal's ties to the governor would protect him, and that Segal was intentionally committing a felony. Segal rejected the plan. But he retained Hales & Company, financial consultants, to evaluate NNIB's prospects of raising capital by attracting new investors. Soon after Hales was retained, its chief executive officer received a phone call from Segal saying that an anonymous letter had been sent to the Illinois Department of Insurance (IDOI) reporting the PFTA deficit. The Hales vice-president in charge of the account concluded that the PFTA was out of trust by $24 million—even after Segal put $10 million from a mortgage on his home into the account. Hales secured loans for NNIB, and the situation was finally corrected when Firemen's Fund and AIG each loaned NNIB $10 million. The loans, however, came with restrictions on Segal's ability to dispose of assets, effectively taking control of NNIB out of his hands.

A less dramatic aspect of the situation involved petty cash. Dan Watkins, an employee in NNIB's accounting department, maintained a petty cash account of $20,000. A ledger was kept with strict accounting of even small withdrawals for NNIB expenses. In contrast, every week, thousands were put in an envelope for Segal. Watkins eventually pled guilty to embezzlement for his part in the transactions.

NNIB often paid Segal's personal credit card bills—to the tune of $36,000 for the years 1999-2001. Employees of NNIB also performed personal services for him and his family. Evidence showed that between 1999 and 2001 Segal had $667,000 in unreported income for the value of services rendered.

In addition, Segal had employees make political contributions with personal checks. NNIB then reimbursed them. Segal also provided discounts on insurance premiums for political figures.

One influential person helpful to Segal was Nathaniel Shapo. Shapo's first job out of college was interning for Illinois' then-lieutenant governor, George Ryan. Shapo next worked for Ryan when Ryan was the Illinois secretary of state. After Shapo graduated from law school he worked on Ryan's gubernatorial campaign. Ryan was elected and appointed Shapo, who was then six months out of law school with no insurance background, as director of the Illinois Department of Insurance. Homer Ryan, the governor's son, introduced Segal to Shapo. When the previously mentioned anonymous tipster informed the IDOI of NNIB's PFTA deficit, IDOI began an investigation. Fortuitously for Segal, at that time he had a meeting scheduled with Shapo. Before the meeting, Governor Ryan called Shapo to say he hoped things would go well for NNIB, and after, called to ask how the meeting had gone. Shapo told Ryan that IDOI would not do an official examination of NNIB because it would kill a $20 million deal Segal had in the works.

Segal was also involved in providing insurance for the Chicago Transit Authority's reconstruction project on its Blue Line, a contract which NNIB was awarded. The contract was fee-based; no commissions were to be paid to the broker. However, before the contract was signed, Segal arranged to have one of NNIB's subsidiaries broker some of the coverages—and earn a commission of $370,000, an arrangement not revealed to the CTA.

Finally, in what seems—in the context of this case—to be almost a minor infraction, NNIB had a policy of writing off customer credits. After a credit owed to a customer had been carried on the books for a while without a

payment demand, the credit was simply written off. Account executives were trained not to notify customers that they were owed credits. Segal personally approved of these write-offs, and in the judgment against him he was ordered to pay $471,000 in restitution to the victims.

Segal and NNIB have raised a number of issues on appeal. We begin with their claim that they were the targets of vindictive prosecution. They contend that additional charges were leveled against Segal and charges were brought against NNIB in retaliation for their pursuit of civil remedies against former NNIB executives who were cooperating with the government.

Before the present criminal case began, Segal and NNIB filed suit in state court against former NNIB executives Matt Walsh and Dana Berry, alleging that they violated noncompete clauses in their contracts with NNIB. After that—but not because of it—the government charged Segal with one count of fraud; at that time no charges were filed against NNIB. Then Segal and NNIB prepared a draft amended complaint in their civil case and showed it to the prosecutors in the criminal case. The amendment alleged that Walsh and Berry illegally acquired proprietary information from a former NNIB information technologist, who had hacked into the company's computer system. When shown the amended complaint, the prosecutor protested that the allegations were not made in good faith and were intended to harass and intimidate Walsh and Berry, who were expected to be government witnesses. The prosecutor said that if the amended complaint was filed, the government would take it into account in deciding whether to bring charges against NNIB and to charge Segal under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 *et seq.* (RICO). The amended complaint was filed and the grand jury returned superseding indictments doing just that. Claiming that the additional charges were the result of vindictive

prosecution, Segal and NNIB moved to dismiss the indictment. The district judge denied the motion without a hearing.

On a claim of vindictive prosecution, we review the district court's legal conclusions *de novo* and its findings of fact for clear error. *United States v. Falcon*, 347 F.3d 1000 (7th Cir. 2003); *United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006).

The Constitution prohibits initiating a prosecution based *solely* on vindictiveness. "[F]or an agent of the [United States] to pursue a course of action whose objective is to penalize a person's reliance on his legal rights" is "a due process violation of the most basic sort . . . ." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); *Jarrett*, 447 F.3d at 525. After a trial, in very limited circumstances, courts have applied a burden-shifting presumption of vindictiveness where prosecutors have pursued enhanced charges after a defendant successfully challenged a conviction and was awarded a new trial. But we stated in *Jarrett* that our precedents do not provide for the application of such a presumption before trial. It remains a fact that a pretrial claim of vindictive prosecution is extraordinarily difficult to prove. To prevail on this sort of claim, *Jarrett* holds that a defendant must affirmatively show that the prosecutor was motivated by animus, "such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *Id.* And it must be recognized, in reviewing a claim of vindictiveness before trial, that prosecutors have "wide discretion over whether, how, and when to bring a case." *Id.* As the Supreme Court has said, "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct. As we made clear in *Bordenkircher*, the initial

charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." *United States v. Goodwin*, 457 U.S. 368, 382 (1982).

That the initial charges may not reflect the extent of a defendant's wrongdoing is clearly illustrated by the evidence in this case. It is hard to imagine that any prosecutor would fail to find NNIB a proper defendant or fail to conclude that Segal's wrongdoing extended far beyond one fraud count. The evidence supports the indictment, and Segal and NNIB have not made a showing of vindictiveness. What they point to in an attempt to support the claim is a statement by a prosecutor that if the defendants filed the amended complaint, that would be taken into account in deciding on RICO charges and charges against NNIB. The prosecutor's statement was based, however, on the belief that the allegations in the amended civil complaint were not made in good faith but, to the contrary, were intended to harass and intimidate government witnesses. A prosecutor cannot be said to act vindictively by taking into account a defendant's perceived efforts to intimidate witnesses. In short, defendants have not made out a claim for vindictive prosecution, nor have they shown sufficient evidence to warrant a hearing on the claim.

Next, the defendants claim that there was a fatal variance between the indictment and the proof at trial. This claim fares no better. Specifically, they argue that the evidence showed multiple schemes to defraud rather than the single scheme charged in the indictment. We treat such a claim as an attack on the sufficiency of the evidence, and we review the evidence in the light most favorable to the government. *United States v. Olson*, 450 F.3d 655 (7th Cir. 2006).

Much summarized, the fourth superseding indictment charged the defendants with a single scheme to defraud

and to obtain money and things of value from the PFTA (an account they were required to maintain for the benefit of customers and insurance carriers) by creating the false appearance that payments to NNIB would be held in trust for payment of premiums, that credits due customers would be refunded to them, and that the customers would receive honest services. Rather than a single scheme, defendants contend that evidence at trial revealed three separate schemes: failure to maintain sufficient funds in the PFTA; writing off of customer credits; and collection of a commission from the CTA contract for Blue Line renovation. The district court found that the evidence was sufficient for the jury to find that the fraudulent acts were all part of a single scheme. We agree.

As part of their argument on this point, the defendants characterize the misuse of the PFTA account as improper borrowing which did not actually harm anyone or benefit them, certainly a benign interpretation of the facts. And the law is otherwise. The unauthorized use of money from an insurance premium trust account is mail fraud even if the defendant did not gain and the victim did not lose. *See United States v. Vincent*, 416 F.3d 593 (7th Cir. 2005). The claim that the carriers were at little risk ignores the facts which show that NNIB was often late in paying carriers and had to hold checks to carriers until it came up with sufficient funds to send them out. By 2001, NNIB had to obtain cash from affiliates to pay premiums and by the end of that year had to borrow $30 million to meet its obligations. In addition, it is hard to see how the defendants can contend that the credit write-offs were unrelated to the larger scheme. Withholding of credits directly deprived customers of money they were owed and of the honest services of their broker. In addition, it reduced the PFTA deficit, at least to some degree. Proceeds from other acts, such as the CTA fraud, were commingled in the PFTA and used for a variety of unau-

thorized purposes. Political contributions and premium discounts to influential people provided Segal with cover to prevent discovery of his financial shenanigans. In short, the evidence supports a finding of an overarching scheme involving the misuse of the PFTA account, as alleged in the superseding indictment.

We turn next to the claim that the jury instructions regarding mail and wire fraud were improper. The defendants were convicted of fraud for depriving another of the "intangible right to honest services" pursuant to 18 U.S.C. § 1346. They contend that the jury instructions misstated the law and that there is a likelihood that the instructions confused the jury into thinking the defendants could be convicted for violations of Illinois insurance law. The defendants further contend that state law is always irrelevant under the statute. Alternatively, they say that if state law is relevant, it was overemphasized in the instructions. We review the instructions as a whole to determine whether they fairly treat the issues. *United States v. Murphy*, 469 F.3d 1130 (7th Cir. 2006).

The argument that state law is always irrelevant in determining the scope of a fiduciary duty, the breach of which may give rise to a deprivation of honest services, is foreclosed by *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998). *Bloom* makes clear that state laws are useful for defining the scope of fiduciary duties, and that what distinguishes a mere violation of fiduciary duty from a federal fraud case is the misuse of one's position for private gain.

Our conclusion is not altered by our decision in *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007). Defendants argue that in *Thompson* we rejected the notion that simple violations of administrative rules provide the basis for a mail fraud conviction. In fact, what we said is that there is a "potential to turn violations of state rules

into federal crimes," at which point we explained that our decision in *Bloom* specifically protects against that danger and remains the governing legal standard. The case against Thompson simply did not measure up.

Georgia Thompson was a state procurement officer who steered a travel contract to the low bidder (who made legal campaign contributions to an incumbent governor) even though other people involved in the selection process rated a rival company more highly. The theory of the prosecution was that she deprived the state of her honest services—that is, her "duty to implement state law the way the administrative code laid it down . . . ." The private gain—the *Bloom* requirement—was a tiny salary increase of $1,000 per year and an alleged improvement in her job security for pleasing her superiors who allegedly favored the company she backed. We soundly rejected the government's theory. First, we found that Thompson already had job security as a civil servant. We then analyzed the case based on the assumption that she received the raise for steering the contract. Even using that assumption, we concluded that "a raise approved through normal civil-service means is not the sort of 'private gain' to which *Bloom* refers." *Thompson* does not change the *Bloom* rules, but merely reinforces them.

Furthermore, this case differs from *Thompson* in both degree and in kind. The difference in degree hardly bears mentioning—a $30 million fraud versus a $1,000 per year civil service raise. But, more importantly, it differs in kind. We concluded that Thompson did not act out of private gain, whereas Segal knowingly and intentionally misused the PFTA for his own very significant private gain. *Bloom* remains the law in this circuit and *Thompson* does nothing to change the result in our case today.

As to the instructions, the jury was told that the defendants were charged with violations of various federal

laws, including the mail fraud, wire fraud, and racketeering laws. The instructions specifically state that the defendants "are not charged in this case with any state crimes or any violations of state regulations." The jury was told that it "should consider the following provisions of Illinois law . . . in determining the existence, the scope and the nature of defendants' legal and fiduciary duties in this case." The instructions also state:

> To find defendants guilty of the charged federal offenses, it is not enough to find that one or both of the defendants violated Illinois law or the Illinois Insurance Regulations. Your job is to decide whether the government has proven beyond a reasonable doubt every element of each federal offense charged in the indictment based on the instructions I give you. Even if you believe that the defendants violated Illinois law or Illinois Insurance Regulations, you should return a verdict of not guilty if you also believe that the government has not proven every element of the particular charged federal offense you are considering beyond a reasonable doubt.

The defendants proposed an instruction, which was rejected, that the intent necessary to convict was the intent to defraud, not the intent to violate state law. Even though the defendants' specific proposed instruction was rejected, the jury was instructed that it had to find that the defendants acted knowingly and with intent to defraud. "Scheme to defraud" and "intent to defraud" were defined without any reference to state law. Viewed as a whole, we find the instructions fairly informed the jury that state law was to be used only to determine the nature of the defendants' legal and fiduciary duties.

Segal also contends that the jury was not properly instructed on the "pattern" element of the RICO charge. He does not claim that the instructions which were given

were erroneous or that the evidence was insufficient to prove a pattern. But he wanted an instruction that "a multiplicity of mailings or interstate communications may be no indication of the requisite pattern or racketeering activity because each mailing or wire communication was a separate offense and the number of offenses 'does not necessarily translate into a pattern of racketeering activity.'" We reject his argument. In this case there are years of false representations in various mail and wire communications. We have upheld convictions in similar circumstances. In *United States v. Genova*, 333 F.3d 750, 759 (7th Cir. 2003), we said that a jury could conclude that the false mailings in that case were integral to the scheme and that "because the scheme extended over several years, a jury also sensibly could find a pattern of racketeering."

In the final challenge to the convictions, defendants claim that their conviction of insurance fraud under 18 U.S.C. § 1033(b) cannot stand because NNIB was not "engaged in the business of insurance" as required by the statute. NNIB, defendants say, is an insurance broker, not an insurance provider.

The statute defined the "business of insurance" as the writing of insurance or reinsuring of risks "by an insurer, including all acts necessary or incidental to such writing or reinsuring and the activities of persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons[.]" § 1033(f)(1). "Insurer" means "any entity the business activity of which is the writing of insurance or the reinsuring of risks . . . ." § 1033(f)(2). We have previously said that under Illinois law, an insurance broker, or agent of the insured is:

> [o]ne who procures insurance and acts as middleman between the insured and the insurer, and solicits insurance business from the public under no employ-

> ment from any special company, but, having secured an order, places the insurance with the company selected by the insured, or, in the absence of any selection by him, with the company selected by such broker.

*American Ins. Corp. v. Sederes*, 807 F.2d 1402, 1405 (7th Cir. 1986), quoting *Galiher v. Spates*, 262 N.E.2d 626, 628 (1970). Whether the broker is an agent of the insured or the insurer is a question of fact and "[a]lthough an insurance broker typically represents the insured, the broker may also become the agent of the insurer or both parties." *Capitol Indemnity Corp. v. Stewart Smith Intermediaries, Inc.*, 593 N.E.2d 872, 876 (Ill. App. 1992). Whether an entity is an agent of the company or the insured is determined by its actions. The evidence in this case is sufficient to support a finding that the defendants were engaged in the business of insurance as that term is broadly defined in the statute to include "all acts necessary to incidental to such writing or reinsuring." § 1033(f)(1).

We now turn to issues involving the forfeiture and restitution orders. Restitution was ordered against both Segal and NNIB in the amount of $841,527.96. They contend the evidence did not support $542,291[1] of that amount. The latter amount was attributable to credits—due to customers—which were written off. Of that amount, $357,079 was alleged to be owed but not paid to Waste Management. Segal presented an affidavit from Waste Management's risk management director saying that the sum was not owed to his company. But given other evidence, it was certainly possible that Waste Management didn't know it had credits coming.

---

[1] The uncontested amount is the restitution ordered to be paid to the CTA for the illegal commission on the Blue Line project.

We review the district court's calculation of restitution for abuse of discretion. *United States v. Swanson*, 394 F.3d 520, 526 (7th Cir. 2005); *United States v. Danford*, 435 F.3d 682 (7th Cir. 2006). We review the evidence in the light most favorable to the government. *Olson*, 450 F.3d 655 (7th Cir. 2006). The government is required to prove the entitlement to restitution by a preponderance of the evidence. In this case, the credits occurred in 1999, and the findings regarding the victims and the amounts they were owed were based on a report prepared by a government auditor and attached to the government's objections to the presentence report. NNIB CFO McNichols testified about a meeting with Segal in the fall of that year in which old, unclaimed credits were reviewed. Segal gave instructions to write them off. Another witness testified that if a client did not ask for the credit for a period of time, it was written off. Including these unpaid credits in the restitution order cannot be said to have been erroneous.

On the forfeiture issues, an initial matter involves Segal's claim that he was prejudiced by his absence from the hearing at which a preliminary forfeiture order was entered. We review the issue *de novo*, *United States v. Smith*, 31 F.3d 469 (7th Cir. 1994), to determine whether Segal's due process rights were violated. A defendant has a due process right to be present "'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97 (1934)). But "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder*, 291 U.S. at 107-08. The determination is made in light of the record as a whole. *United States v. McCoy*, 8 F.3d 495 (7th Cir. 1993). In this case, the hearing resulted only in a prelimi-

nary order; the actual forfeiture was further litigated at a later time. Segal's counsel was at the hearing and no testimony was taken. When addressing this issue at a later proceeding, District Judge Castillo stated:

> I have taken a close look at that particular issue, and I've read the pleadings. The record I think is reflected in the pleadings that have been filed very ably and adequately by Mr. Segal's counsel that reflects that the preliminary forfeiture order was entered without him being here. That was an oversight. As I said at the point in time when the preliminary forfeiture order was entered, if we had all had our thinking caps on, that order should have been entered at the point in time immediately following the return of the verdict, but there was a lot of issues going on, not the least of which was whether or not Mr. Segal would be detained pending sentencing or not.
>
> That being the case, the record will reflect that during the entire period from the point in time that preliminary forfeiture order was entered until Mr. Segal's attorneys filed their written objection, I think a period of 30 days, no issue was ever brought before this Court by way of any—not even one- or two-paragraph motion saying Mr. Segal should have been present at the preliminary forfeiture proceeding. It was never brought. And that the record will reflect.
>
> The record will also reflect that it's this Court's conclusion that Mr. Segal has been more than adequately represented during that period of time and that extensive objections have been filed to the preliminary forfeiture proceeding.

So Judge Castillo concluded that if there was an error, it did not prejudice Segal. We agree with that conclusion. Furthermore, there were almost countless hearings

regarding the forfeiture in this case, hearings at which Segal was present unless he voluntarily chose not to attend, as was the case on December 29, 2004. All in all, we are not convinced that Segal's due process rights were violated when the preliminary forfeiture was entered.

Segal also raises issues regarding the forfeitures themselves. 18 U.S.C. § 1963(a) provides that a person convicted of a RICO violation shall forfeit the enterprise "which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962" and "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection . . . ." The judgment against Segal required the forfeiture of both.

As to the enterprise, Segal contends that it was error for the court to set aside the jury verdict. The contention requires some explanation. The "enterprise" in this case was NNIB and related affiliates. Segal was the sole owner of the enterprise. The judge instructed the jury that Segal's interest in the enterprise was subject to forfeiture to the extent the enterprise was tainted by racketeering activity. The verdict form asked the jury to reply "yes" or "no" to the question whether Segal held an interest in the enterprise and, if so, what percentage of Segal's interests were tainted. The jury replied "yes" and answered the latter question 60 percent. However, the judge ordered forfeiture of 100 percent of the enterprise, thus the argument is that the "60 percent verdict" was set aside. The court noted that under § 1963(a), Segal's interest in the enterprise subjected 100 percent of the enterprise to forfeiture. That is a correct conclusion. The error was in submitting the percentage question to the jury in the first place. The error, however, had no bearing on the case. The fact is that the jury found that Segal had an interest in the enterprise. In fact, Segal owned the enterprise. The

evidence at trial to that effect was not simply sufficient, but overwhelming. And § 1963 requires forfeiture of the enterprise.

Segal also objects to the forfeiture of $30 million in proceeds. He argues that there is a fatal variance between the allegations of the indictment and the theory of forfeiture employed at his trial. He also contends that the evidence is insufficient to support the amount of the forfeiture.

The indictment charges that Segal's interest subject to forfeiture is

> at least $20,000,000, including but not limited to all salary, bonuses, dividends, pension and profit sharing benefits received by defendant MICHAEL SEGAL, from NNIB and NNNG acquired and maintained during the period 1990 through 2001.

He says that the indictment must be interpreted to mean that only his executive salary of $120,000 per year, the cash he took from petty cash, and the claims for personal expenses are subject to forfeiture. In addition, he says the government must show what proportion of his executive compensation consisted of racketeering proceeds. We cannot agree.

The items Segal mentions are, indeed, subject to forfeiture, but so is some of the money he stole from the PFTA. There is no requirement that proceeds be in the form of more-or-less legitimate salary payments or shady small reimbursements. While the indictment mentions salaries, bonuses, etc., it also says the forfeiture includes but is not limited to those items and that "at least" $20,000,000 is subject to forfeiture. In short, the indictment does not limit the forfeiture to the specific items it mentions or the ones Segal acknowledges. Assets forfeited as proceeds in *Genova*, a case on which Segal places considerable

reliance, included clearly illegal bribes, as well as seemingly legitimate attorney fees. In fact, the defendant in *Genova* conceded that the bribes he received were subject to forfeiture. Here, the evidence is sufficient to show that money was stolen from the PFTA. It is also sufficient to show what the amount was. The evidence shows a deficit which grew over the years. At the end of 1989 the PFTA was over $7 million out of trust. At the end of 1995 it was $10 million short. Dennis Pogenburg of the Hales Groups testified that in the fall of 2001 the deficit was $24 million—*after* $10 million in borrowed money had been deposited into the fund. McNichol testified that at the end of April 2001 the PFTA deficit was $29 million. By the end of 2001, $30 million was borrowed to meet NNIB's premium obligations.

Segal makes much of the fact that our cases require that proceeds forfeitures be of net, not gross, proceeds and that while restitution is loss based, forfeiture is gain based. He is correct about the legal principles, as *Genova* and *United States v. Masters*, 924 F.2d 1362 (7th Cir. 1991), make clear, but wrong about the application to his case. Here, the amount stolen is equal to the amount of the deficit. The gain is equal to the loss.

Furthermore, the $30 million is net, not gross, proceeds to Segal. It is true that to collect the funds which went (briefly) into the PFTA, NNIB had expenses—employee salaries, etc. But taking the money once it was there did not cause Segal to incur expenses. He does not say, for instance, that he paid someone to help him make off with the funds. The expenses involved in the acquisition of the $30 million were borne by NNIB; the defendant from whom the forfeiture is sought is Segal. To him, it was all net proceeds, figuratively, all gravy.

Again, *Genova* may provide a loose analogy. Jerome Genova was the mayor of Calumet City, Illinois. He

appointed Lawrence Gulotta as city prosecutor and arranged for Gulotta's law firm to get most of the city's legal business. Gulotta kicked back to Genova about 30 percent of the payments the law firm received from the city. The kickbacks were a cost of doing business and, because we require forfeiture on net proceeds, were deducted from Gulotta's forfeiture of his fees. However, the kickbacks were net proceeds to Genova. In Segal's case, as well, the pilfered funds were net proceeds to him—if not to NNIB.

Segal also argues, though, that he paid the money back, and apparently for that reason he thinks the $30 million is not subject to forfeiture. We have trouble seeing why paying the money back means that he did not take it in the first place. More importantly, he did not personally pay it back. He paid it back by borrowing from Firemen's Insurance and AIG in loans, primarily secured by assets of the company.

All of that said, what is not clear from the record is how much of the $30 million was poured back into the enterprise and how much went to benefit Segal personally. Without that information we cannot determine whether at least part of the $30 million forfeiture would constitute double billing, given that the amount that went back into the company will be forfeited through the forfeiture of the enterprise. Double billing, as the Court of Appeals for the Third Circuit has said, cannot be the intent of Congress:

> We do not believe that Congress intended forfeiture verdicts to double if property forfeitable under section 1963(a)(1) also happened to be forfeitable under section 1963(a)(2). To read the statute to permit such verdict doubling would introduce an arbitrariness into the statute that could not have been contemplated by Congress.

*United States v. Ofchinick*, 883 F.2d 1172, 1182 (3rd Cir. 1989). Accordingly, we will remand the case to the district court for a determination of what portion of the $30 million was not reinvested in the enterprise, but rather went to benefit Segal personally and is subject to forfeiture as proceeds of the illegal enterprise.

Finally, Segal argues that the forfeiture violates the Excessive Fines Clause of the Constitution. We review constitutional questions *de novo. United States v. Kirschenbaum*, 156 F.3d 784 (7th Cir. 1998).

In *United States v. Bajakajian*, 524 U.S. 321, 334 (1998), the Court held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." It is true that the forfeiture is large. It is only excessive, however, if it is disproportional to the offense. We cannot say that it was. This was a massive fraud. When a defendant commits a multimillion-dollar crime, he can be required to forfeit assets also running into the millions.

For all these reasons, the judgment of forfeiture of the proceeds of the racketeering activity is VACATED and REMANDED for further proceedings in the district court. In all other respects, the judgments against Segal and NNIB are AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*
