FILED
United States Court of Appeals
Tenth Circuit

April 29, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

ROBERT VIGIL,

      Defendant - Appellant.

No. 07-2060

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 05-CR-2051-JB)**

---

Laura Fashing, Assistant U.S. Attorney (Larry Gomez, United States Attorney, on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

Jason Bowles (B.J. Crow of Bowles and Crow; Sam Bregman and Eric Loman of The Bregman Law Firm, on the brief), Albuquerque, New Mexico, for Defendant - Appellant.

---

Before **KELLY**, **ANDERSON**, and **MURPHY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Defendant-Appellant Robert Vigil was convicted by a jury of attempted extortion in violation of 18 U.S.C. § 1951. In post-trial proceedings, the district court denied his motions for judgment of acquittal. United States v. Vigil, 506 F.

Supp. 2d 544 (D.N.M. 2007); United States v. Vigil, 478 F. Supp. 2d 1285 (D.N.M. 2007). He was sentenced to 37 months' imprisonment followed by three years' supervised release. On appeal, Mr. Vigil challenges of the sufficiency of the evidence supporting his conviction. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

Mr. Vigil was the New Mexico State Treasurer from January 2003 to October 2005. George Everage was an employee of the New Mexico State Treasurer's Office ("STO") who proposed to Mr. Vigil a method of raising more income for the office through a securities lending program. Mr. Everage left the STO to bid for a contract to oversee this program as the Securities Lending Oversight Manager ("SLOM"). Mr. Everage created a business entity SECSYS, LLC which submitted a proposal to the STO to act as the SLOM forecasting that based on the banks' proposals as securities lending agents, the income that SECSYS, LLC would receive was $105,450 in gross proceeds. Before Mr. Everage left the STO, Mr. Vigil told him that he had a friend whose wife needed a job and asked him if he would hire her if he received the contract. Mr. Vigil told Mr. Everage that he would have to pay her $500 to $1,000 per month, and that by hiring her he would be helping Mr. Vigil out. Ann Marie Gallegos, Mr. Vigil's Assistant Treasurer, asked Mr. Everage repeatedly if he had met with Samantha

Sais to come to an agreement with her. Mr. Everage did not see the need for an employee, but he agreed to meet with Ms. Sais, the wife of Mr. Vigil's friend, thinking she might be a courier and do some clerical work.

On April 29, 2005, Mr. Everage met with Ms. Sais who said that she expected $55,000 per year in compensation which surprised him: "I almost fell out of my chair. It went from $500 to $1,000 a month to $16,000 a year to $55,000 a year." Aplt. App. at 92. Mr. Everage determined during the meeting that Ms. Sais's "knowledge of securities lending was nonexistent," and that hiring her would compromise his business plan. Ms. Sais explained that Mr. Vigil owed her husband, Michael Montoya, for past favors, Mr. Vigil had not been forthcoming, and Mr. Montoya was considering running against Mr. Vigil in the next election.

Following the meeting on May 2, 2005, Mr. Everage called Mr. Vigil who explained that he needed Mr. Everage to hire Ms. Sais as a favor and if he did not, "this deal was not going to go forward, it was going to die." Id. at 98. According to Mr. Everage, Mr. Vigil said that Ms. Sais's skill set was needed in the STO, prompting Mr. Everage to wonder why the STO didn't hire her. Mr. Vigil indicated that the main reason he wanted Mr. Everage to hire her was "to get her off his ass." Id. at 98–99. Previously, Tomasita Gallegos, an STO employee, determined that since most of the information would flow automatically and electronically into the STO's accounting system, it would not

- 3 -

take her much time to perform the necessary computer work needed by a SLOM.

Initially, Mr. Everage submitted his proposal to the STO without Ms. Sais. He testified that he did so in part because "it would have put me in a position where I had to subordinate my interests to hers." Id. at 100. Ms. Gallegos called Mr. Everage on behalf of the STO and told him that he would have to resolve things with Ms. Sais and submit her resume with his proposal. Although Mr. Everage believed he would violate the request for proposals ("RFP") by including Ms. Sais as a subcontractor, he submitted her name as a potential subcontractor because he believed he would not get anywhere unless he made an accommodation to Ms. Sais.

By the end of May 2005, the STO sent Mr. Everage the SLOM contract, requesting he sign it, and after he signed and returned the contract, the STO sent him three proposals from securities lending agents for his evaluation. Mr. Everage reviewed the responses and prepared a report evaluating them. On June 10, 2005, Mr. Everage met with Ms. Sais a second time, because of pressure from the STO, and proposed that she receive 40% of his net income. Ms. Sais responded that she wanted 40% of his gross income because Mr. Vigil owed her husband. During the meeting, it became clear to Mr. Everage that Ms. Sais did not want to work for the compensation. Three days later, Mr. Vigil spoke with Mr. Everage by telephone telling him that he offered Ms. Sais 40% of net. Mr. Vigil responded, "No, no just deal with this [Mr. Everage], we can't, we can't

deal with net, it can't work." Id. at 151. Mr. Vigil said that Ms. Gallegos was "writing letters I guess to cancel this thing, that's why I called you . . . we're not gonna do this if we don't have uh . . . a way of doing it." Id. at 154–55. Then Mr. Vigil told Mr. Everage to call Ms. Gallegos to "fix it, otherwise, . . . you're gonna put me through two more weeks of this crap." Id. at 156. Mr. Vigil told him that 10% of something was better than 10% of nothing, suggesting that is what he would get if he did not hire Sais.

Following this conversation, Mr. Everage sent a letter to the STO explaining his position. The STO responded that there was no binding contract because Ms. Sais was critical to the contract and that if Mr. Everage did not respond in two weeks with a satisfactory arrangement with Ms. Sais, it would reissue the RFP hoping for more satisfactory responses. In another letter, the STO terminated any contract with Mr. Everage. The STO subsequently offered the SLOM contract to an individual who admittedly knew nothing about securities lending but who agreed to hire Ms. Sais as a condition of receiving the SLOM contract.

On appeal, Mr. Vigil raises six issues: (1) whether his conduct was "wrongful" and not merely hard bargaining or political patronage; (2) whether he "obtained property" from Mr. Everage; (3) whether he used actual or threatened force, violence, or fear; (4) whether the government met the quid pro quo requirement showing that he obtained property "under color of official right;" (5)

- 5 -

whether his conduct affected interstate commerce; and (6) whether he took a substantial step toward the commission of extortion.

<u>Discussion</u>

We review the sufficiency of the evidence to support a jury's verdict and the denial of Mr. Vigil's motion for judgment of acquittal de novo. <u>United States v. Burkley</u>, 513 F.3d 1183, 1188, 1190 (10th Cir. 2008). We ask whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom. <u>See</u> <u>id.</u> at 1188.

The Hobbs Act makes unlawful conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). The Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." <u>Id.</u> § 1951(b)(2).

A.    <u>Wrongful Conduct</u>

First, Mr. Vigil argues that his conduct was not wrongful as defined by the Hobbs Act but merely hard bargaining or political patronage. The Supreme Court defined the meaning of "wrongful" as used in the Hobbs Act: "'[W]rongful' has

meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." United States v. Enmons, 410 U.S. 396, 400 (1973). Mr. Vigil argues that his conduct was simply hard bargaining and that he was within his rights to require that someone else perform the computer monitoring and reporting. Mr. Vigil is correct that hard bargaining is not wrongful under the Hobbs Act, but his characterization of the facts is far too narrow given our standard of review.

Mr. Vigil demanded that Mr. Everage hire a specific individual, Ms. Sais, to fill the role despite Mr. Everage's conclusion that Ms. Sais's skills were not needed. Mr. Vigil insisted that Mr. Everage pay her the salary she demanded, 40% of his gross income from the contract, leading Mr. Everage to believe it was a condition to receiving the contract. A rational jury could certainly conclude that Mr. Vigil's conduct was "not mere hard bargaining but the exploitation of the fear of economic loss in order to obtain property to which the exploiter is not entitled." Brokerage Concepts, Inc., v. U.S. Healthcare, Inc., 140 F.3d 494, 523–24 (3d Cir. 1998). Mr. Vigil was entitled to evaluate proposals for adequacy on behalf of the state,[1] but he was not entitled to direct the disposition of the income from the contract or specify who was to be hired to perform it. See

---

[1] Mr. Everage testified that the securities lending transactions would flow from the custodial bank into the STO's accounting system, exceptions were rare and that Ms. Sais's skills were not needed.

United States v. Gotti, 459 F.3d 296, 327 (2d Cir. 2006) (recognizing the intangible property rights to make business decisions free of outside pressure and to decide with whom to work). The district court was entirely correct that the jury was free to reject Mr. Vigil's "hard bargaining" theory and conclude that Mr. Vigil was not concerned with negotiating a lower fee to benefit the state but to shift a portion of the income the contract would generate to Ms. Sais. See Vigil, 478 F. Supp. 2d at 1306.

Mr. Vigil also argues that Mr. Everage was not entitled to any commissions because many steps needed completing before any commissions would be generated such as selecting securities lending agents on agreeable terms and regulatory approval. This argument ignores the fact that Mr. Vigil was charged with attempted extortion, so the government must only prove a substantial step towards commission of the crime and not the completed offense. In addition, the evidence shows that Mr. Vigil expected Mr. Everage to earn income from the contract and that Mr. Everage would pay Ms. Sais a portion of that income—so even though the contract was not fully executed, all the parties involved acted on the assumption that the contract would generate income.

Finally, Mr. Vigil argues that even if he had political motivations to provide income to Ms. Sais under the contract, political considerations do not make his actions extortionate. Mr. Vigil relies on United States v. Thompson, where a state procurement official was acquitted of mail fraud and bribery when

she violated administrative rules in steering a travel contract to a low bidder (and campaign contributor to the governor) even though other members of the working group rated a rival company more favorably. 484 F.3d 877, 878–79 (7th Cir. 2007). Thompson reasoned that it is "preposterous" that state or local officials violate federal law when they take account of political considerations in spending public money. Id. at 883. Ms. Thompson was acquitted because the court concluded that she had not misused her office for private gain when the only evidence of gain was a later raise of $1,000, approved through above-board channels. See id. This case is distinguishable because the government offered evidence that Mr. Vigil misused his office for private gain. Mr. Vigil was not merely taking account of political considerations in awarding a contract, but conditioning the award of the contract on the hiring of a specified individual at the price she named to payoff a personal political debt.

### B. Obtaining Money or Property

Mr. Vigil contends that Mr. Everage did not have any money to be obtained and that the government's intangible property theory varies from the indictment. According to Mr. Vigil, Mr. Everage did not have any money or property to obtain because no enforceable contract existed. Mr. Vigil contends that Mr. Everage's business plan was nothing more than speculative potential.

Property under the Hobbs Act may be tangible or intangible property, see Gotti, 459 F.3d at 320–21, and we have no difficulty concluding that Mr. Vigil

attempted to obtain both tangible and intangible property from Mr. Everage. First, Mr. Vigil attempted to obtain money from Mr. Everage and direct that money to Ms. Sais. See United States v. Green, 350 U.S. 415, 420 (1956) (extortion may be proven where payments are made to a third party). We reject the argument that the income was too speculative because abundant evidence supports the view that all parties involved treated the right to income under the contract as a valuable interest. There was extensive testimony concerning the negotiations between Mr. Vigil, Mr. Everage, and Mr. Sais to quantify the amount of Ms. Sais's "take" against a backdrop of the gross proceeds from the contract under Mr. Everage's business plan.

Second, the Supreme Court has reaffirmed that Hobbs Act cases relying on an intangible rights theory such as United States v. Tropiano, 418 F.2d 1069, 1076 (2d Cir. 1969) (holding that the intangible right to solicit refuse collection accounts is "property" under the Hobbs Act), are still good law. See Scheidler v. Nat'l Org. of Women, Inc., 537 U.S. 393, 402 n.6 (2003). The Second Circuit recently held that a number of intangible property rights were cognizable under the Hobbs Act, including inter alia, the right to contract with a party of one's choosing, the right to make various business decisions free from outside pressure, and the right to decide with whom to work. See Gotti, 459 F.3d at 326–27. The government presented evidence that Mr. Vigil attempted to force Mr. Everage to hire Ms. Sais as a condition for receiving the SLOM contract. A reasonable jury

could conclude that this evidence demonstrates that Mr. Vigil attempted to obtain Mr. Everage's intangible right to make business decisions free from outside pressure and to decide with whom to work.

Second, Mr. Vigil argues that the government's intangible rights theory varied from the indictment and constitutes a constructive amendment to the indictment. After reviewing Mr. Vigil's post-trial pleadings before the district court, it does not appear that Mr. Vigil raised a constructive amendment argument below. Therefore, our review is for plain error. See United States v. Gonzalez Edeza, 359 F.3d 1246, 1250 (10th Cir. 2004). We reverse for plain error only when there is "(1) an error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Chavez-Calderon, 494 F.3d 1266, 1268 (10th Cir. 2007). However, even if Mr. Vigil had raised the issue before the district court, we conclude that there was no error, plain or otherwise, constituting a constructive amendment or variance from the indictment.

We recognize two types of variances: "[a] constructive amendment, which is reversible per se, occurs when the district court's instructions and the proof offered at trial broaden the indictment," and "[a] simple variance arises when the evidence adduced at trial establishes facts different from those alleged in the indictment, and triggers harmless error analysis." United States v. Sells, 477 F.3d 1226, 1237 (10th Cir. 2007). The indictment alleges that "part of the attempted

extortion" was that Mr. Vigil both "required George Everage to hire [Ms. Sais] as a subcontractor . . . as a condition of Everage doing business with the [STO]" and "required George Everage to pay a substantial portion of the value of the [SLOM] contract to [Ms. Sais], all as a condition of Everage's employment."  Aplt. App. at 26.  The allegation in the indictment that Mr. Vigil attempted to force Mr. Everage to hire Ms. Sais is sufficiently broad to support an intangible rights theory.

### C.    Threat of Economic Harm

Under the Hobbs Act, extortion may be proved by showing "actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2) (emphasis added).  Mr. Vigil argues that economic fear is only wrongful under the Hobbs Act if the plaintiff had a pre-existing statutory right to be free from the defendant's demand.  See Brokerage Concepts, 140 F.3d at 523.  Mr. Vigil is correct that economic fear arising from hard bargaining is permitted, for example in the union context, where union officials have a claim to the property they receive and achieve legitimate objectives or provide genuine services that the employer seeks.  See Enmons, 410 U.S. at 400.  However, economic fear is inappropriate to obtain personal payoffs where, for example, union officials exact payments from employers in return for "imposed, unwanted, superfluous and fictitious services of workers."  Id. (quotations omitted).  Applying this rule, Mr. Vigil is entitled to evaluate proposals for adequacy on

behalf of the state and even insist on certain capabilities, but he has no right to demand that Mr. Everage hire a specific and unwanted individual at the price she sets. This is not a legitimate objective or genuine contract term that Mr. Vigil can rightfully demand. Ms. Sais's services were unwanted by Mr. Everage, and evidence at trial suggested that the compensation was intended as a personal payoff to Mr. Vigil's former associate Mr. Montoya rather than to achieve a legitimate objective such as ensuring SECSYS, LLC has sufficient computer monitoring and reporting expertise.

Mr. Vigil's attempt to distinguish United States v. Collins, 78 F.3d 1021 (6th Cir. 1996), is similarly unavailing. The Sixth Circuit noted that the individuals bidding on the contracts in Collins "acted out of fear that without the payments they could lose the opportunity to compete for government contracts on a level playing field, an opportunity to which they were legally entitled . . . [and] [t]hey paid out of a fear that . . . they would forfeit any potential business opportunity" with the state. Id. at 1030. Mr. Vigil contends that the victims in Collins were required to make payments to have an opportunity to bid and be considered for government contracts, but that Mr. Everage had every right to bid and be considered for the contract here. The distinction Mr. Vigil identifies is not meaningful. The difference between the two cases is that the payments to Ms. Sais were to be made going forward out of the proceeds generated under the contract, but the agreement to make those payments was still necessary to close

the deal. Mr. Vigil's actions were not merely hard bargaining just because his threats of economic harm occurred at a later stage in the negotiating process than those in Collins.

D.     Official Color of Right

To prove extortion "under color of official right," 18 U.S.C. § 1951(b)(2), "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts," Evans v. United States, 504 U.S. 255, 268 (1992). Defendant contends that this "quid pro quo" element was not met because there was insufficient evidence that the award of the contract was conditioned on including Ms. Sais. However, the evidence was sufficient that a jury could reasonably believe that the only way that Mr. Vigil would award Mr. Everage the contract was if he agreed to hire Ms. Sais and pay her the compensation she demanded.

E.     Interstate Commerce

Mr. Vigil argues that his actions did not affect interstate commerce as required for a conviction under the Hobbs Act. See 18 U.S.C. § 1951(a). The words of the Hobbs Act suggest that Congress intends to use all of its authority under the commerce clause. Scheidler, 537 U.S. at 408. The government need only demonstrate a de minimis affect on commerce, United States v. Nguyen, 155 F.3d 1219, 1224 (10th Cir. 1998), and the government may satisfy its burden by showing an actual effect or a potential effect on interstate commerce. See United

States v. Toles, 297 F.3d 959, 969 (10th Cir. 2002).

Mr. Vigil relies on United States v. Mattson, 671 F.2d 1020 (7th Cir. 1982), arguing that the depletion of an individual employee's assets by robbery or extortion usually does not meet the jurisdictional requirement. That is a correct statement of the law, but Mr. Vigil plainly and negatively affected the operations of a business, SECSYS, LLC, formed by Mr. Everage. For example, the evidence in the light most favorable to the government suggests that the SLOM contract would have resulted in securities transactions between the STO and multi-state lending agents with up to 30% of the fee going to SECSYS, LLC. Mr. Vigil argues that SECSYS, LLC is Mr. Everage's alter ego and should be disregarded for purposes of determining whether interstate commerce was affected. While it is possible to pierce the corporate veil under certain circumstances, Mr. Vigil's bare allegation, without authority or facts in support, is insufficient to do so.

Mr. Vigil also analogizes United States v. Schaefer, 501 F.3d 1197, 1200–01 (10th Cir. 2007), where we reversed the conviction of an individual's use of the Internet to obtain child pornography because the government presented insufficient evidence to satisfy the interstate commerce element. Schaefer is distinguishable for two reasons. First, the court concluded in Schaefer that Congress did not intend to exercise its full Commerce Clause power in enforcing the child pornography statute, 18 U.S.C. § 2252. Id. at 1202. Second, the government's only evidence regarding interstate commerce was that the defendant

used the Internet, and the court declined to assume that "Internet use automatically equates with a movement across state lines." Id. at 1205. Schaefer is limited to its facts—the government's say so was not enough to prove that the Internet operates in interstate commerce, no matter how obvious. Id. at 1207–08 (Tymkovich, J., concurring).

Moreover, the government presented evidence that the business assets of SECSYS, LLC would have been depleted by 40% of gross revenue had Mr. Everage acceded to Mr. Vigil's demands. See Nguyen, 155 F.3d at 1224–25 (holding jurisdiction satisfied where a robbery and murder depleted the assets of a business engaged in interstate commerce). Evidence at trial also showed that the STO sent Mr. Everage proposals from three securities lending agents—Dresdner Bank, Wachovia Bank, and Northern Bank—all multi-state institutions. A rational jury could certainly conclude that Mr. Vigil's acts either actually or potentially affected interstate commerce, notwithstanding that the deal was not closed and securities lent. See United States v. Foster, 443 F.3d 978, 983–84 (8th Cir. 2006).

F.     Substantial Step

To prove an attempt crime, the government must prove an (1) intent to commit the substantive offense; and the (2) "commission of an act which constitutes a substantial step towards commission of the substantive offense." United States v. Smith, 264 F.3d 1012, 1015 (10th Cir. 2001). Mr. Vigil only

contests that he did not make a substantial step towards committing extortion. A substantial step must be something more than mere preparation. See id. at 1016. It is "an appreciable fragment of a crime and an action of such substantiality that, unless frustrated, the crime would have occurred." Id.

Mr. Vigil argues that the only possible action that could have constituted a substantial step was for Mr. Vigil to order a securities lending deal and then have the deal fall through due to circumstances beyond his control. Mr. Vigil argues that 13 events had to occur before extortion was committed, for example, various state departments would need to approve the contract, the attorney general would need to review the contract and Mr. Vigil would need to have signed it, the securities lending agents would need to bid, be selected, and enter into contracts with the state, and Mr. Everage would need to receive his commission and split it with Ms. Sais.[2]

We do not require that a defendant be "on the verge of committing the specific act," rather, the law "allows criminal liability to attach at some point prior to the last proximate act." United States v. Prichard, 781 F.2d 179, 182 (10th Cir. 1986). The steps that Mr. Vigil lists are largely ministerial steps, and Mr. Vigil has not pointed to any evidence that these administrative approvals would not be obtained, especially given that Mr. Vigil was in charge of the

---

[2] Many of the events Mr. Vigil lists already had occurred, for example, Mr. Everage signed the contract and made his recommendations for the securities lending agents.

- 17 -

process and evidence at trial indicated that Mr. Vigil wanted Ms. Sais to receive the compensation.

Mr. Vigil relies heavily on United States v. Joyce, 693 F.2d 838 (8th Cir. 1982), and People v. Miller, 42 P.2d 308 (Cal. 1935), arguing that he abandoned his alleged intention when he refused to give Mr. Everage the contract because Mr. Everage would not hire Ms. Sais. In those cases, the defendants did not complete the crimes because they abandoned their intention to do so, and both courts held that the defendants did not take a substantial step. However, these cases are inapposite because Mr. Vigil did not abandon his intention to complete the deal, Mr. Everage did. When Mr. Everage refused to hire Ms. Sais, Mr. Vigil rescinded the contract or terminated negotiations over the contract with Mr. Everage and offered the contract to another individual conditioned on the hiring of Ms. Sais. A reasonable jury could conclude that the deal would have been completed but for Mr. Everage's refusal to include Ms. Sais in the contract.

Also contrary to Mr. Vigil's contention, Mr. Vigil's acts did "carry the project forward within dangerous proximity to the criminal end," People v. Bracey, 41 N.Y.2d 296, 300 (N.Y. 1977). Only Mr. Everage's refusal to give Ms. Sais the compensation she demanded stopped the program from moving forward. This case is similar to another case holding that a defendant took a substantial step towards possessing methamphetamine when he agreed to a time and place for a drug transaction, then changed the location, and arrived at the new location.

United States v. Ramirez, 348 F.3d 1175, 1180 (10th Cir. 2003). The court concluded that the transaction would have taken place but for the undercover agent's refusal to show up at the new location. See id. at 1181.

Mr. Vigil presents no evidence that any other aspect of Mr. Everage's bid, qualifications, or anything else was preventing the deal from being finalized. At best, Mr. Vigil's argument may simply be that his actions occurred in a context too far removed from the completion of the crime to be considered an attempt. However, this argument depends on the view of the evidence, and on sufficiency review, we are required to view the evidence in the light most favorable to the government. See United States v. Jameson, 478 F.3d 1204, 1208 (10th Cir. 2007). In addition, attempted extortion does not require Mr. Vigil actually obtain property but only that he "attempted to induce his victim to part with property." Foster, 443 F.3d at 985 (internal quotations omitted).

Finally, Mr. Vigil's actions constituted a substantial step toward the commission of extortion: for example, the May 2, 2005 phone call where Mr. Vigil told Mr. Everage that he would not get the contract unless he reached an agreement with Ms. Sais; and the June 13, 2005 phone call where Mr. Vigil told Mr. Everage that he could not pay Ms. Sais based on net and that the STO was in the process of cancelling the contract if Mr. Everage could not work out an agreement with Ms. Sais. These actions were not mere preparation but were threats that constituted "an appreciable fragment of [the] crime." Smith, 264 F.3d

1016.

AFFIRMED.