[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15039

_____

D.C. Docket No. 8:11-cr-00197-SCB-TGW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

MICHAEL JIMENEZ,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 25, 2013)

Before WILSON and COX, Circuit Judges, and VINSON,[*] District Judge.

WILSON, Circuit Judge:

_____

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

Defendant-Appellant Michael Jimenez appeals his conviction for intentionally misapplying $5,000 or more from an organization receiving in excess of $10,000 in federal funds in a one-year period, in violation of 18 U.S.C. § 666. Jimenez argues that insufficient evidence supported his conviction. Specifically, he contends that he did not "intentionally misapply" funds within the meaning of § 666(a)(1)(A). We agree with Jimenez that no reasonable construction of the evidence presented at trial permits a finding that he intentionally misapplied funds. Therefore, we reverse his conviction.

## I.  FACTUAL BACKGROUND

Jimenez's conviction arises from his tenure as the Deputy Director of Fiscal and Administrative Services for Hillsborough County's Head Start Program (Head Start). Head Start is a county operated, federally funded program that provides education and health care to preschool children from low-income families. The program has branches in almost every county in the United States.   Jimenez began working at Head Start in 2007.

Jimenez's wife, Johana Melendez Santiago (Melendez), is a microbiologist and an instructor at Hillsborough Community College. Between 2007 and 2009, Melendez made several presentations on bloodborne pathogens to Head Start employees, most of whom were aware that she was Jimenez's wife. In the spring of 2010, Melendez sent an e-mail to her husband concerning a book she had

recently written.  The book, *Travel Boy Helps Sebastian Trapping the Germs/El Niño Viajero ayuda a Sebastián Atrapando los gérmenes* (*Travel Boy*), is a bilingual children's book written to educate children "about germs and their relationship to disease."  In the e-mail, Melendez suggested that Head Start could use the book to "encourage kids to read."  Jimenez relayed this information to his peer, Marie Mason, Head Start's Deputy Director of Program Services.  From the beginning, Mason knew that Jimenez's wife had authored *Travel Boy*.  Jimenez and Mason brought a copy of the book to Marecia Bell, a registered nurse with Head Start.  Mason asked Bell to look at the book and offer her opinion on whether Head Start should order copies of the book for Head Start's children.

Bell reviewed the book and concluded that it was too mature for Head Start's children.[1]  Bell also showed the book to Idalin Navejar, a family information-systems specialist in Head Start's health department.  Navejar advised Bell against recommending the book for purchase because it implicated a conflict of interest for Jimenez's wife to profit from a Head Start transaction.  Bell and Navejar brought this concern to the attention of Ron Knight, Bell's direct supervisor.  Despite Bell's and Navejar's misgivings, Mason—who supervised Knight—told Bell to order the book.  Bell did not have purchasing privileges, so

---

[1] Specifically, Bell found the book too mature in the sense that *Travel Boy*'s ideas were too complex, e.g., there was an illustration of a thermometer reading 102 degrees Fahrenheit. Head Start's children range from six weeks to five years old.

3

she referred the task to Navejar.  Shortly thereafter, Jimenez e-mailed Navejar to tell her that she could expect price quotes on *Travel Boy* in the near future.  The next day, Melendez e-mailed Navejar with price quotes for orders of 800, 1,000, and 1,300 copies.

After several e-mail exchanges, on May 3, 2010, Navejar requested new quotes from Melendez, with the caveat that the total price could not exceed $10,000.  Purchases exceeding $10,000 are handled by Hillsborough County's procurement office, rather than Head Start personnel.  Navejar could not recall who told her to keep the order under $10,000, but Mason eventually authorized Bell to do just that.

That same day, Mason initiated and approved a $9,000 purchase order for 750 copies of *Travel Boy*.  Mason's order also received the rubber stamp of Louis Finney, Jr., Head Start's Division Director.  In June 2010, Melendez delivered the books to Head Start, and submitted a vendor request form that included a W-9 for her company.  Linda Edman processed a report authorizing payment to Melendez for the books.  Jimenez signed a form acknowledging that the books had been received, and on July 1, 2010, Head Start issued a $9,000 check to Melendez.

Throughout the time period at issue in this case, Head Start required every employee to complete appropriate disclosure forms within 45 days of any change in his "conflict of interest" status, which included circumstances in which an

4

employee's spouse entered into a contractual relationship with Head Start. Jimenez failed to disclose the conflict of interest stemming from his wife's transaction with Head Start.

## II.  PROCEDURAL BACKGROUND

In April 2011, a federal grand jury indicted Jimenez, Mason, and Melendez on charges of fraud.  On July 14, 2011, a Tampa jury found Jimenez guilty on two of three fraud counts: (1) intentionally misapplying funds concerning programs receiving federal funds in violation of 18 U.S.C. § 666; and (2) honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.  The jury found Jimenez not guilty of conspiring to commit offenses against the United States in violation of 18 U.S.C. § 371.  Mason and Melendez, who faced the same charges as Jimenez, were acquitted on all three counts.  County officials fired Jimenez in March 2011; Mason still works at Head Start.

After the verdict, Jimenez moved for acquittals on his honest services fraud and § 666 convictions, based on the insufficiency of the government's evidence. The district court set aside the honest services conviction, agreeing with Jimenez that the government had failed to prove that Jimenez received a bribe or a kickback.  *See Skilling v. United States*, 130 S. Ct. 2896, 2931 (2010) (holding that § 1346 only criminalizes honest services fraud when it involves bribes or kickbacks).  The district court declined to set aside Jimenez's § 666 conviction

5

because "the evidence at trial, viewed in the light most favorable to the [g]overnment," established the crime's essential elements.  Jimenez ultimately received 36 months of probation and a $9,000 restitution order.  Jimenez now appeals the trial court's denial of his motion for a judgment of acquittal on his § 666 conviction.

### III. ANALYSIS

We review de novo the denial of a motion for a judgment of acquittal, viewing the evidence in the light most favorable to the government.  *United States v. Keen*, 676 F.3d 981, 989 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 573 (2012). A conviction will be upheld "unless the jury could not have found the defendant guilty under any reasonable construction of the evidence."  *United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008).  Put another way, we will only reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt.  *See United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (per curiam).

Section 666 of Title 18 applies to entities that receive more than $10,000 annually from the federal government, as Head Start does.  Under this statute,

> (a) Whoever . . .
>> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
>>> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any

person other than the rightful owner *or intentionally misapplies*, property that–
>            (i) is valued at $5,000 or more, and
>            (ii) is owned by, or is under the care, custody, or control of such organization, government or agency[,]

commits a felony.  18 U.S.C. § 666(a) (emphasis added).  Thus, it was the prosecution's burden in this case to establish that: (1) Jimenez was an agent of Head Start; (2) he obtained by fraud or intentionally misapplied property of Head Start valued at $5,000 or more; and (3) Head Start received federal assistance in excess of $10,000 in 2010.  *See Keen*, 676 F.3d at 989.  The prosecution theorized that Jimenez "intentionally misapplied" $9,000 of Head Start's funds by brokering its purchase of 750 copies of his wife's book.

Courts have struggled to discern § 666's contours, especially the modified verb "intentionally misapplies."  Congress left this critical phrase undefined, so we must "give it its ordinary meaning," keeping in mind the context of the statute. *United States v. Santos*, 553 U.S. 507, 511, 128 S. Ct. 2020, 2024 (2008).  Read too narrowly, federal prosecutors would be unable to effectuate the statute's purpose of "protect[ing] the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," *Sabri v. United States*, 541 U.S. 600, 606, 124 S. Ct. 1941, 1946 (2004) (quoting S. Rep. No. 98-225, p. 370 (1983)); read too broadly, courts would run afoul of the Rule of Lenity, "which insists that ambiguity in criminal legislation be read against the

7

prosecutor," *United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007); *see Santos*, 553 U.S. at 514, 128 S. Ct. at 2025 ("The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.").

We find the Seventh Circuit's opinion in *Thompson* helpful—if not to definitively decide *what* "intentionally misapplies" means, at the very least to decide what it *does not* mean.  In *Thompson*, Georgia Thompson, the section chief of Wisconsin's Bureau of Procurement, appealed her § 666 conviction for misapplying funds in the selection of a travel agency for the state government. *Thompson*, 484 F.3d at 878.  Wisconsin employed an intricate point-system to determine which travel agent would be awarded a sizeable government contract. *Id.*  Although Adelman Travel was the low bidder, another travel agency was ahead on points.  *Id.*  After some delay by Thompson, the Bureau of Procurement decided, pursuant to state law, to rebid the contract in a "best-and-final procedure." *Id.* at 881.  Adelman Travel reduced its price, pushing it into first place and securing the contract.  *Id.* at 879.  Three months later, Thompson received a $1,000 raise.  *Id.*

The prosecution speculated that Thompson had steered a government contract to Adelman for "political reasons."  *Id.* at 878.  The potential political reasons included: (1) Adelman was a local business; (2) Adelman's president had been a financial supporter of Wisconsin's governor; and (3) Thompson favored

Adelman because it was cheaper, and the governor had promised to run a more cost-effective government. *Id.* at 879–80. Based on this, and nothing more, Thompson was convicted of "intentionally misapplying" funds. *Id.* at 878.

On appeal, the Seventh Circuit decided that a jury could not have found beyond a reasonable doubt that Thompson intentionally misapplied agency funds. *Id.* at 880. Thompson received neither a bribe nor a kickback, and at worst she had made a "deviation from state procurement rules." *Id.* Thompson's conduct was not an intentional misapplication because "[a]s long as the state [got] what it contract[ed] for, at the market price, no funds have been misapplied, even if the state's rules should have led it to buy something more expensive (and perhaps of higher quality too)." *Id.* at 881–82. We can assume that if the contract price had included a bribe or a kickback to Thompson, the evidence would have been sufficient to affirm her conviction. *See id.* at 881. We read *Thompson* to stand for the general rule that minor deviations of state or local law are not always sufficient to establish an "intentional misapplication," especially when the record evinces neither a bribe nor a kickback.

What was beyond dispute in *Thompson* was that the defendant herself applied the funds: she was the section chief of the procurement office, she presided over the bidding process, and she suggested that the contract be rebid in a best-and-final procedure. *Id.* at 878–79. Yet Thompson's conduct did not implicate the

9

"mis" in "misapply" because the state got what it paid for and Thompson did not receive an illicit commission.  *Id.* at 881–82.

In the present case we deal with a different question: our focus is not on the prefix of "misapply," but rather on the verb's stem. In other words, one cannot "misapply" funds without having "applied" them in the first place.  Because we conclude that the evidence is insufficient to demonstrate that Jimenez "applied" or directed any funds whatsoever, his conviction must be reversed.

Black's Law Dictionary defines "misapplication" as "the improper or illegal use of funds or property lawfully held."  Black's Law Dictionary 1013 (7th ed. 1999).  In circular fashion, "use" is defined as "the application or employment of something."  *Id.* at 1540.  By way of example, we have held that an agency's Chief Financial Director, who had supervisory authority over federal grants, intentionally misapplied funds when he misused them for personal expenses.  *See, e.g., United States v. Williams*, 527 F.3d 1235, 1244–45 (11th Cir. 2008); *see also United States v. Baldridge*, 559 F.3d 1126, 1139 (10th Cir. 2009) (upholding a § 666 intentional misapplication conviction where a county commissioner filed false payment claims with the county); *United States v. Frazier*, 53 F.3d 1105, 1111 (10th Cir. 1995) (upholding a § 666 intentional misapplication conviction where the defendant signed checks for training that never occurred and directed an employee to sign backdated invoices); *United States v. Urlacher*, 979 F.2d 935,

10

936–37 (2d Cir. 1992) (upholding a § 666 intentional misapplication conviction where a police chief diverted hundreds of thousands of dollars, condoned the making of false accounting entries, and directed a subordinate to destroy records).

Whatever its precise definition, circuit caselaw indicates that "misapply" is a verb connoting an actor who exercises some degree of power over his agency's purse. In light of that interpretation, we hold that the prosecution's evidence could not have demonstrated that Jimenez misapplied Head Start's funds.

The government points to *United States v. Cornier-Ortiz* for the proposition that whenever the employee of a § 666 qualifying organization skirts conflict of interest rules, a federal crime has occurred. 361 F.3d 29, 37 (1st Cir. 2004). In *Cornier-Ortiz*, Cornier hired the brother of a Puerto Rico Public Housing Administration (PRPHA) employee—Puerto Rico's liaison to the United States Department of Housing and Urban Development—in a quid pro quo scheme where the PRPHA employee would treat favorably Cornier's request for federal funds. *Id.* at 32. The First Circuit held that payments for a legitimate purpose, in that case the brother's salary, could be "intentionally misapplied" if they undermined a conflict of interest prohibition. *Id.* at 37. Our holding today is in no way inconsistent. To be clear, we do not mean to say that violating a conflict of interest

11

policy can never form the basis of a § 666 conviction.[2]   We hold instead that evidence of an undisclosed conflict of interest is insufficient, standing alone, to sustain a conviction for "intentionally misapplying" funds within the meaning of § 666.  We read *Cornier-Ortiz* as upholding the conviction of a defendant who misapplied funds through a manipulation of the PRPHA.  Cornier's conflict of interest indicated the dishonest nature of his scheme, but his other actions—having a sham employee, for one—demonstrated that he was calling the shots.  By contrast, it can hardly be said that Jimenez directed the use of Head Start funds.

The prosecution points to three supposedly incriminating actions by Jimenez: (1) he forwarded an e-mail from his wife to Mason; (2) he was with Mason when she asked Bell for her opinion on *Travel Boy*; and (3) he approved a receiving report that acknowledged Head Start's receipt of the books.  From these three actions, the prosecution contends that Jimenez committed a federal felony. We, however, are convinced by the evidence that Mason, and not Jimenez, directed the application of funds in this case.  No reasonable jury could have found otherwise.  It was Mason who asked Bell for her opinion of *Travel Boy*; it was Mason who told Bell to order the book; it was Mason who initiated the purchase

---

[2] We note that the First and Second Circuits have expressly defined the term "intentional misapplication" to mean the misuse of federal funds for otherwise legitimate purposes. *See, e.g.*, *Cornier-Ortiz*, 361 F.3d at 37; *Urlacher*, 979 F.2d at 938.  Because we conclude that Jimenez did not apply Head Start's funds whatsoever, we neither adopt nor reject this definition.

order; and, finally, it was Mason who approved the purchase order.[3]  Admittedly, Jimenez did not disclose his wife's financial stake in the transaction, but we are reluctant to metamorphose every municipal misstep into a federal crime.

We recognize the ambitious objectives of § 666, an expansive statute that aims to "ensur[e] the integrity of entities receiving substantial sums of federal funds." *Keen*, 676 F.3d at 991.  At the same time, we are unwilling to stretch § 666's language to its breaking point.  No reasonable jury could have found beyond a reasonable doubt from the evidence that Jimenez misapplied government funds.  Accordingly, we reverse Jimenez's conviction, and the case is remanded with instructions to enter a judgment of acquittal.

**REVERSED AND REMANDED.**

---

[3] The government alleges that Jimenez conspired with Mason to force Navejar to keep the order under $10,000, but Navejar could not recall who initially told her to keep the order under $10,000.  Both sides concede that Mason eventually authorized Navejar to keep the order under $10,000.  Mason was acquitted on all three counts of the indictment.

13