FILED
United States Court of Appeals
Tenth Circuit

October 23, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

  Plaintiff - Appellee,

v.

EDILBERTO FIGUEROA-CRUZ,

  Defendant - Appellant.

No. 11-3343

(D. Kansas)

(D.C. No. 6:11-CR-10049-MLB-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **MCKAY**, and **TYMKOVICH**, Circuit Judges.

---

Defendant Edilberto Figueroa-Cruz appeals his conviction of possession

with intent to distribute more than 500 grams of cocaine. *See* 21 U.S.C.

§ 841(a)(1). The cocaine was found hidden in a speaker box in the trunk of a car

that he had been driving on the highway. He presents three arguments on appeal:

(1) there was insufficient evidence that he knew of the cocaine in the car; (2)

statements by the passenger in the car were inadmissible hearsay; and (3) the

district court should not have admitted the arresting officer's testimony about

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

what indicators of criminal activity he observed before searching the car.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.      BACKGROUND

On March 16, 2011, Kansas Highway Patrol officer Jason Duffey was patrolling on eastbound I-70 about 50 miles east of the Colorado border when he saw a Nissan Maxima approaching quickly behind him. His rear-facing radar clocked the car at 76 miles per hour in a 70-miles-per-hour zone. Duffey could see the passenger's head moving back and forth, suggesting that he was conversing with the driver. The Nissan moved into the passing lane but then braked hard and was going only 65 miles per hour when it passed Duffey. As the car passed, the passenger's eyes were closed and his head was turned to the side, as if he were sleeping.

Duffey briefly followed the Nissan and then engaged his emergency lights without turning on his siren. The passenger instantly sat up and the car pulled over. Duffey approached the car on the driver's side, where Defendant was sitting. The window was rolled down. Duffey explained to Defendant why he had stopped the car and asked for his driver's license. Defendant, whose hands were "shaking violently," R., Vol. 3 at 58, produced what appeared to be a Mexican driver's license, although it had a San Jose, California, address. At Duffey's request, Defendant also removed a California identification card from his wallet, telling Duffey that it had "expired," *id.* at 61. Because Defendant's

hands were shaking so hard, Duffey asked if he was all right. Defendant laughed and said that he was just nervous. Duffey noticed a cell phone in Defendant's lap and two cell phones in the center console, one of which was a Boost Mobile phone.

Duffey asked Defendant where he and the passenger were going. Defendant responded that they were traveling to Kansas City. When Duffey asked what was going on there, the passenger, Abraham Moreno-Ceron, said that they were going to look for work. Duffey inquired whether Defendant owned the car. Again, Moreno-Ceron answered, saying that the vehicle belonged to him (Moreno-Ceron) and that he had just bought it. Duffey requested the car's paperwork and Moreno-Ceron's identification. Moreno-Ceron handed over the documents. The 1996 Nissan had been registered two days before in Oregon (the car had Oregon license plates). The registered owner was someone named Lorenzo Ramos Oveth. Moreno-Ceron explained that a friend, whose name he did not know, had registered the car for him because he could not afford the fee at the time.

Duffey asked the car's two occupants what they did for work. Moreno-Ceron responded that they were unemployed. When Duffey asked where in Kansas City they were going, Moreno-Ceron said that he did not know and that they would find out when they got there. Moreno-Ceron was shaking, and was breathing very deeply and rapidly.

Duffey returned to his car to examine the documents, but was unable to validate any of the information. He returned to the driver's window and told Defendant that he was just giving him a warning for speeding. Defendant thanked him, but his hands continued to shake. As Duffey returned to his patrol car, he heard the driver's door open. He turned around to see that Defendant was getting out of the car. Defendant explained, "We're just switching." *Id.* at 72. At that point, Duffey asked if he could search the vehicle. Moreno-Ceron consented.

In the trunk, Duffey saw two duffle bags, a blanket, and a large speaker box. The box was very clean, indicating that it had not been there long. Unlike the usual box, it was not covered by carpet, so Duffey could see a seam that went around the back of the box. It was screwed to a back plate. Duffey unscrewed the back plate and found cocaine in two packages inside.

Defendant and Moreno-Ceron were indicted in the United States District Court for the District of Kansas. Defendant was tried separately, convicted by the jury, and sentenced to 66 months' imprisonment. As we address Defendant's issues on appeal, we will include additional information concerning the trial.

## II.    ANALYSIS

### A.    Sufficiency of the Evidence

We review de novo the sufficiency of the evidence of guilt. *See United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). "We ask whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing

the evidence in the light most favorable to the government and drawing reasonable inferences therefrom." *Id.*

The gist of Defendant's argument on the sufficiency of the evidence is that there is insufficient evidence that he knew of the cocaine in the Nissan. We disagree. To begin with, "[t]his court has held that it is permissible to infer that the driver of a vehicle has knowledge of the contraband found within it." *United States v. Cota-Meza*, 367 F.3d 1218, 1224 (10th Cir. 2004); *see United States v. Pulido-Jacobo*, 377 F.3d 1124, 1130 (10th Cir. 2004) (jury could infer that codefendants, who shared responsibility for driving vehicle containing contraband hidden in the gasoline tank, had knowledge of the contraband).

Most probative of Defendant's guilty knowledge, however, was the incredible explanation of the mission of the vehicle's occupants. *See United States v. Isaac-Sigala*, 448 F.3d 1206, 1212 (10th Cir. 2006) (jury can infer defendant's guilty knowledge from his false exculpatory statements); *United States v. Hernandez-Rodriguez*, 57 F.3d 895, 899 (10th Cir. 1995) (defendant's improbable story about how he and codefendant obtained vehicle from "good Samaritan" strangers supported jury conviction of importation of marijuana hidden under car seat (internal quotation marks omitted)). Defendant's documents identify him as a resident of San Jose, California. He is said to be out of work, but for some reason he joins a fellow who purchased the Nissan in Oregon two days earlier to travel across country to Kansas City to find

employment—without any knowledge of where in the city they will actually find it. And the car's owner, the passenger at the time of the stop, does not even have the car registered in his own name, having let a friend, whose name he cannot recall, register it because the owner (who just bought the car) cannot afford the registration fee. True, most of this story came from Moreno-Ceron, not Defendant. But Defendant heard every word. And even though Defendant apparently spoke Spanish as his primary language, he displayed sufficient knowledge of English in his conversation with Duffey that the jury could believe that he well understood what Moreno-Ceron was saying. The jury could then (1) ask why Defendant would be silent as Moreno-Ceron gave his absurd answers and (2) infer that Defendant feared that truthful answers would be incriminating.

Further, Defendant displayed exceptional nervousness. *See United States v. Cui Qin Zhang*, 458 F.3d 1126, 1128 (10th Cir. 2006) (nervous behavior is proper consideration in finding defendant guilty of possessing cocaine in trunk of car); *United States v. Lazcano-Villalobos*, 175 F.3d 838, 844 (10th Cir. 1999) ("At the check point, [the defendant's] hand shook, evidencing his nervousness and knowledge of the hidden cocaine [in the vehicle]."). And the two occupants of the car had three cell phones, one of which was a Boost Mobile phone. Duffey testified that multiple cell phones, particularly if one is a Boost Mobile phone (which is difficult to trace and can be easily discarded), are indicative of drug trafficking. Although there are certainly legitimate reasons to have a cell phone,

three phones would seem a bit of a luxury for two out-of-work job hunters. *See United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008) (multiple cell phones supported inference that defendant was guilty of drug offense).

In our view, it was eminently reasonable for the jury to find Defendant guilty of the charged offense.

**B.     Admission of Moreno-Ceron's Statements**

Defendant argues that Duffey's testimony about what Moreno-Ceron told him was inadmissible hearsay. The statements, however, were not admitted for a hearsay purpose. "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party *offers in evidence to prove the truth of the matter asserted* in the statement." Fed. R. Evid. 801(c) (emphasis added).

Moreno-Ceron's statements were not hearsay because they were not offered for their truth. The government's theory was that Defendant and Moreno-Ceron were driving east on I-70 to deliver cocaine to someone, not to look for work in Kansas City. The statements were offered as a false cover story, indicating consciousness of guilt. *See United States v. Lewis*, 594 F.3d 1270, 1284 (10th Cir. 2010) (statements offered as false are not hearsay). Therefore, the court did not err in admitting them.

**C.     Duffey's Testimony**

During direct examination, the prosecutor asked Duffey what indicators he had before the search that Defendant and Moreno-Ceron were engaged in criminal activity. Duffey testified as follows:

> The first indicator that I had noticed was the elevated level of nervousness prior to stopping the vehicle. It's unusual to see driver and passenger conversing and then as they pass me, the passenger acts like he's going to sleep, or that he went to sleep, or that he is asleep. That was very unusual to me.
>
> The second indicator I observed was the hands shaking of Mr. [Figueroa-]Cruz. And when I had asked him if he was alright he stated that he was just nervous; however, he could not give me a reason as to why he was nervous.
>
> The passenger also had a high level of nervousness. When he handed me the documents to the vehicle and his driver's license, his hands were also shaking and his breathing was very deep and rapid. I observed multiple cellular phones in the vehicle, one of which being a boost mobile phone. Drug couriers often use multiple cellular phones when trafficking narcotics and especially boost mobile phones due to the fact that they're virtually untraceable and if encountered by us they can discard them easily and not be detected.
>
> In talking to the passenger, they had stated that they were going to Kansas City to look for work; however, they didn't know where they were going in Kansas City. They stated they were just going to look. And I can't—I couldn't believe that somebody would invest that time and money to purchase a car and travel to Kansas City and not have anything lined up without first looking on the internet or making any phone calls or anything of that nature.
>
> The passenger had stated that the vehicle was his. And then it was registered through the—the Notice of Transaction registered to Lorenzo Ramos Oveth, which [sic] wasn't present. I had asked the passenger about that. He had stated that a friend had registered it for him because he couldn't afford to register it at the time. I asked him what his friend's name was and he stated that he didn't know.

R., Vol. 3 at 73–75. Defendant contends that this testimony was not admissible because (1) it violated Fed. R. Evid. 704(b), which prohibits testimony that the

defendant had the requisite *mens rea*; and (2) any relevance of the testimony was substantially outweighed by the danger of unfair prejudice, *see* Fed. R. Evid. 402, 403.

Defendant's sole objection to this testimony at trial was, "This isn't a motion to determine whether there was probable cause." R., Vol. 3 at 73. This was certainly not adequate to present an objection under Rule 704(b); and we think it was inadequate to alert the court why the evidence was irrelevant or unfairly prejudicial. We therefore review for plain error. *See United States v. Garza*, 566 F.3d 1194, 1200 (10th Cir. 2009). Consequently, to obtain relief, Defendant "must show '(1) [an] error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, [this] court may then exercise its discretion to notice [the] forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (brackets, citation, and internal quotation marks omitted)). "Because all four requirements must be met, the failure of any one will foreclose relief and the others need not be addressed." *United States v. Gantt*, 679 F.3d 1240, 1246 (10th Cir. 2012).

### i.    Rule 704(b)

Under the language of Fed. R. Evid. 704(a) in effect at the time of Defendant's trial, "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be

decided by the trier of fact." Fed. R. Evid. 704(a) (2011) (amended Dec. 1, 2011). But Rule 704(b) provides an exception:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

*Id.* 704(b) (2011) (amended Dec. 1, 2011). The rule is limited in scope. "Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." *United States v. Richard*, 969 F.2d 849, 854–855 (10th Cir. 1992). By this standard, Duffey's testimony was not improper. He merely stated facts from which a jury could infer that Defendant knew of the cocaine in the trunk. The first requirement of the plain-error test—the existence of error—is not satisfied.

### ii. Relevance

Defendant argues that much of Duffey's "indicators" testimony was inadmissible because any relevance was outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403 (irrelevant evidence is inadmissible); *id.* 403 (relevant evidence may be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice.") To assess this argument, we

must consider testimony by Duffey earlier in the trial—testimony not challenged on appeal. Near the outset of his testimony, Duffey was asked to discuss the "types of things" he looks for during traffic stops to "indicate . . . that a crime is being committed or about to be committed." R., Vol. 3 at 47. The direct examination continued as follows:

> [Duffey:] We look generally at the demeanor of the occupants, the driver, if there is a passenger. We see the level of nervousness, whether it's more so than what a normal traffic stop would consist of. We look at travel plans. We look at—
>
> [Prosecutor:] Let me back you up just a minute. When you say travel plans, what do you mean?
>
> [Duffey:] Just in general we ask—we try to ask where are you headed to, where are you coming from, things of that nature. Just through general conversation, try to see what they have to say about their travel plans.
>
> [Prosecutor:] Well, if somebody says, for example, I'm going to St. Louis to see my grandmother, what would that tell you about and how would that fit into this continuum of an interdiction stop and whether or not you believe a crime is being committed?
>
> [Duffey:] Just by if they're going to see their grandmother, there would be followup questions after that that would help corroborate their story.
>
> [Prosecutor:] Such as?
>
> [Duffey:] When was the last time you were in St. Louis to see your grandmother? What part of St. Louis does your grandmother live in? Things of that nature. Are you originally from St. Louis?
>
> [Prosecutor:] And, for example, if the person said I don't know where my grandmother lives, would that mean something in particular to you?

-11-

[Duffey:] That would be a red flag, yes.

[Prosecutor:] Does the ownership of the car or non-ownership of the car figure in to your study or what you've learned in making interdiction stops?

[Duffey:] Yes, it does. Through training and experience, third party vehicles have been notorious for being part of a crime.

[Prosecutor:] Does it make any difference in the interdiction world as to the presence of or number of cell phones?

[Duffey:] Yes.

[Prosecutor:] Why is that?

[Duffey:] Generally, multiple cellular phones in the vehicle. Narcotics dealers often use multiple cellular phones and especially boost mobile phones because of the fact they know they are virtually untraceable and can be easily discarded if encountered by law enforcement.

[Prosecutor:] Does the presence of a valid driver's license or the absence of a valid driver's license figure into this continuum of interdiction stops and you beginning to wonder about the existence of a crime?

[Duffey:] Yes.

[Prosecutor:] And how is that?

[Duffey:] If they have a valid driver's license, that just indicates that someone had found a valid driver to transport the narcotics in this vehicle. I f they don't have a valid driver's license, that's just something else that we have to factor in or rule out.

[Prosecutor:] For example, if someone has a valid driver's license, for the Ladies and Gentleman, what do you do when you do a stop if someone has a valid driver's license?

-12-

[Duffey:]  As far as?

[Prosecutor:]  Well, let me rephrase it.  If I'm stopped and you ask for my driver's license; is that correct?

[Duffey:]  Yes.

[Prosecutor:]  And you would do that to assure I could drive, I take it?

[Duffey:]  Yes.

[Prosecutor:]  Do you do anything else with that driver's license?

[Duffey:]  That driver's license is run through our dispatch.  We run the driver's license number to ensure validity and to check for any wants or warrants on the subject.

[Prosecutor:]  So that if someone gave you an invalid driver's license, you couldn't check on their past, could you?

[Duffey:]  That's true.  That's correct.

R., Vol. 3 at 47–50.

Thus, much of the challenged "indicators" testimony merely repeated factual observations by Duffey and previous expressions of opinion regarding drug traffickers.  Essentially what was added amounted to argument, applying the opinions to the facts of the case.  In our view, such argument should be reserved for the prosecutor; but even if this component of Duffey's testimony was improper, Defendant fails to show prejudice.  The prosecutor (properly) argued the same points in closing; and most or all of them would have been obvious to the jurors in any event.  Because Defendant has not shown the third requirement

-13-

for plain-error relief—that admission of the evidence "affect[ed] [Defendant's] substantial rights," *Garza*, 566 F.3d at 1200 (internal quotation marks omitted)—we decline to reverse on this ground.

## III. CONCLUSION

We AFFIRM the judgment of the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge